# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| ALBERTO OVALLE, | § |
| | § |
| PLAINTIFF, | § |
| | § |
| VS. | § CIVIL ACTION |
| | § NO. 2:18-CV-00211-D-BR |
| | § |
| UNITED RENTALS | § |
| (NORTH AMERICA), INC., | § JURY TRIAL |
| | § |
| DEFENDANT. | § |

_____

ORAL AND VIDEOTAPED DEPOSITION OF
MICHAEL KARABANOFF
AUGUST 12, 2019

_____

ORAL AND VIDEOTAPED DEPOSITION of MICHAEL
KARABANOFF, produced as a witness at the instance of
Plaintiff, and duly sworn, was taken in the
above-styled and numbered cause on 12th of August,
2019, beginning at 10:03 a.m. to 2:41 p.m., before
Lisa D. Sanchez, CSR in and for the State of Texas,
recorded by machine shorthand, at the offices of Fee,
Smith, Sharp & Vitullo, L.L.P., 2777 Allen Parkway,
Suite 800, Houston, Harris County, Texas, pursuant to
the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto.

## Page 2

I N D E X

                                                    PAGE
Appearances ................................... 3
Stipulations .................................. 4
MICHAEL KARABANOFF
      Examination by Mr. Haynes............... 4
Changes and Signature......................... 198
Reporter's Certification...................... 199

E X H I B I T S
NO.    DESCRIPTION
1 ................................................ *
      First Amended Notice of Intention to Take
      the Oral/Videotaped Deposition of United
      Rentals (North America), Inc.
2 ................................................ 56
      Monthly Training entitled "Safety is a Core
      Value"
3 ................................................ 62
      Monthly Training entitled "Hazard 360"
4 ................................................ 69
      Policy and Procedure Bulletin
      Subject:  Personal Safety Responsibility
5 ................................................ 80
      Policy and Procedure Bulletin
      Subject:  Employee Safety and Health
6 ................................................ 137
      Incident Investigation Report
7 ................................................ 159
      Patient Interview Printable
8 ................................................ 183
      Defendant's First Supplemental Objections
      and Answers to Plaintiff's First Set of
      Interrogatories
9 ................................................ 190
      Performance Document
* Marked prior to the deposition

## Page 3

A P P E A R A N C E S

FOR THE PLAINTIFF:
      Mr. Kevin C. Haynes
      WILLIAMS HART BOUNDAS EASTERBY, L.L.P.
      8441 Gulf Freeway, Suite 600
      Houston, Texas 77017-5001
      Phone:  (713) 230-2200  Fax:  (713) 643-6226
      E-mail address:  pidept@whlaw.com
FOR THE DEFENDANT:
      Mr. Jeff C. Wright
      FEE, SMITH, SHARP & VITULLO, L.L.P.
      Three Galleria Tower
      13155 Noel Road, Suite 1000
      Dallas, Texas 75240
      Phone:  (972) 934-9100  Fax:  (972) 934-9200
      E-mail address:  jwright@feesmith.com

THE VIDEOGRAPHER:
      Mr. Brian Bobbitt
      COMPLETE LEGAL SUPPORT
      3701 Kirby Drive, Suite 500
      Houston, Texas 77098
      Phone:  (713) 521-3330  Fax:  (713) 521-9899
      E-mail address:  clsvideo@prodigy.net

## Page 4

S T I P U L A T I O N S

      (Deposition commenced at 10:03 a.m.)

      THE VIDEOGRAPHER:  We're on the record August 12, 2019.  The time is 10:03 a.m.

      Will the court reporter please swear in the witness?

      THE REPORTER:  And do you want to waive Federal Rule 30(b)(5)?

      MR. HAYNES:  Yes.

      MR. WRIGHT:  Yes.

      THE REPORTER:  And any other stipulations you'd like to put on the record?

      MR. HAYNES:  Just by the Rules.

      MR. WRIGHT:  Yes.

      MICHAEL KARABANOFF,

having been first duly sworn, testified as follows:

      EXAMINATION

BY MR. HAYNES (10:04 A.M.):

      Q.   Good morning.

      A.   Good morning.

      Q.   State your name, please.

      A.   Michael Karabanoff.

      Q.   Mr. Karabanoff, my name's Kevin Haynes.  I represent Al Ovalle in a case he's brought against United Rentals (North America) as a result of injuries

## Page 5

he sustained in March of 2017.  Do you understand who I am?

      A.   Uh-huh, I do.

      Q.   Do you understand why we're here today?

      A.   I do.

      Q.   Have you ever been deposed before?

      A.   No.

      Q.   Well, congratulations on your first deposition.

      I assume you had a chance to meet with your attorney and go over the rules, but let me go over them briefly so we can remain on the same page.  This is obviously a question and answer format.  Everything that's being said in the room is being taken down by the court reporter to my right.  It's, therefore, important for us to make a clear record.  We can do that by me letting you finish your answer and you letting me finish my question.  Does that sound fair?

      A.   Yes.

      Q.   It's important to answer verbally as opposed to hand gestures or uh-huhs or huh-uhs, things like that, because those are harder for her to take down.  Do you understand?

      A.   Yes.

Michael Karabanoff - August 12, 2019

6

1    Q.    I may ask bad questions today.  I'm sorry
2  about that in advance.  If I do, please ask me to
3  repeat or rephrase; and I will try to clear them up
4  for you, okay?
5    A.    Okay.
6    Q.    I may also show you documents today.  Please
7  take as long as you need to familiarize yourself with
8  them so you can understand what they are before you
9  answer a question about them; is that fair?
10    A.    Yes.
11    Q.    And it's not a hostage situation.  So, if you
12  need to take a break, please let me know; and we'll
13  try to accommodate you.  But please just don't take a
14  break between a question and answer, okay?
15    A.    Okay.
16    Q.    And if you answer my question, I'm going to
17  assume you understood it.  Is that fair?
18    A.    Fair.
19    Q.    What is your job title?
20    A.    Safety director.
21    Q.    And state your name one more time, please?
22    A.    Michael Karabanoff.
23    Q.    And what is your job title?
24    A.    Safety director.
25    Q.    Safety director for whom?

7

1    A.    For the tools region for United Rentals.
2    Q.    And what geographic region does that cover
3  exactly?
4    A.    It covers the line of business.
5    Q.    You called it the tools region?
6    A.    Yes.
7    Q.    Could you just tell me what that means in
8  plain English, please?
9    A.    Tools region provides small tools for
10  different contractors that are traveling around the
11  U.S. doing construction jobs.
12    Q.    And you live and work in Houston, Texas,
13  right?
14    A.    Correct.
15    Q.    But your responsibility covers beyond just
16  Houston or even just the state of Texas, right?
17    A.    Correct.
18    Q.    It's nationwide?
19    A.    Correct.
20    Q.    And United Rentals is the largest heavy
21  equipment rental company in the United States, right?
22    A.    To my knowledge.
23    Q.    And it's actually a multinational company,
24  isn't it?
25    A.    As of recently, yes.

8

1    Q.    It operates internationally, correct?
2    A.    To some extent, yes.
3    Q.    Does it operate in all 50 states?
4    A.    No.
5    Q.    How many states does it operate in?
6    A.    I'm not sure.
7    Q.    Okay.  We know it operates in Texas, true?
8    A.    True.
9    Q.    Oklahoma?
10    A.    True.
11    Q.    Louisiana?
12    A.    Yes.
13    Q.    New Mexico?
14    A.    Yes.
15    Q.    California?
16    A.    Yes.
17    Q.    Florida?
18    A.    Yes.
19    Q.    Any others you can think off the top of your
20  head in the southern United States?
21    A.    Most southern states are covered by United
22  Rentals.
23    Q.    All right.  You understand that you're under
24  oath, right?
25    A.    Yes.

9

1    Q.    And you understand that the oath you just took
2  has the same meaning and obligation to tell the truth
3  as if you had taken it before a judge and jury in a
4  court of law, correct?
5    A.    Correct.
6    Q.    And you take the oath seriously, don't you?
7    A.    Yes.
8    Q.    What -- could you just describe for us your
9  basic job responsibilities?
10    A.    My job responsibility for United Rentals is to
11  ensure that I -- I guide my region and set standards
12  for branch managers to execute at a branch level
13  towards their employees, whether it be federal, state
14  regulations, company initiatives, as well as region
15  initiatives for the year.
16    Q.    All right.  What is -- strike.  New question.
17          Tell me what a branch manager is.
18    A.    Branch manager is responsible for the profit,
19  gross loss, assets, asset management, customer care of
20  that branch.
21    Q.    And when you say "branch," you mean like a
22  store, like a facility, right?
23    A.    Correct.
24    Q.    How many facilities does United Rentals have
25  in the United States?  Do you know?

## 10

1  A.  I'm not sure.
2  Q.  Is it in the hundreds?
3  A.  I believe so.
4  Q.  How many does it have in Texas?
5  A.  I couldn't tell you right off the top of my
6  head.
7  Q.  The incident we're here talking about today
8  took place at the Canyon, Texas, facility, right?
9  A.  Correct.
10  Q.  And Canyon is near Amarillo, correct?
11  A.  Correct.
12  Q.  Back in 2017, were you still the safety
13  director for the tools region?
14  A.  Correct.
15  Q.  How long have you been the safety director for
16  the tools region?
17  A.  Since 2013.
18  Q.  Who was the branch manager for the Canyon
19  facility in 2017?
20  A.  At the time, Art was overseeing the
21  operations, reporting to the district manager, Carlos
22  Ortegon.
23  Q.  Could you spell his last name?
24  A.  O-r-t-e-g-o-n.
25  Q.  And did you mention somebody else in that

## 11

1  answer?
2  A.  Art Silva was the operations manager.
3  Q.  S-i-l-v-a?
4  A.  Uh-huh.
5  Q.  Yes?
6  A.  Yes.
7  Q.  Okay.  So, at the time -- I'm sorry.  Could
8  you explain that to me one more time, please?
9  A.  At the time, the ops manager was overseeing
10  the Canyon branch, reporting directly to the district
11  manager, Carlos Ortegon.
12  Q.  So, was there an official branch manager at
13  the time?
14  A.  Not to my knowledge.
15  Q.  Why not?
16  A.  That branch was in transition, and the D.M.
17  was overseeing the operations because Art was in
18  place.
19  Q.  Art was in place?
20  A.  (Nods head)
21  Q.  Meaning, Mr. Silva?
22  A.  Yes.  Correct.
23  Q.  When you say it "was in transition," what do
24  you mean by that?
25  A.  That -- that branch was in transition to

## 12

1  either get a branch manager or possibly promote Art
2  Silva into that role.
3  Q.  Who was the previous branch manager for the
4  Canyon location?
5  A.  I don't remember.
6  Q.  Do you know how long it had been, as of the
7  time of this incident, since the Canyon facility had a
8  branch manager?
9  A.  I'm not sure.
10  Q.  Do you know the circumstances under which the
11  prior branch manager left the company?
12  A.  No, I do not.
13  Q.  Do you know anyone at the company that would
14  know that?
15  A.  No, I -- I wouldn't.
16  Q.  So, you were living and working in Houston
17  back in 2017?
18  A.  Correct.
19  Q.  Did the Canyon facility comprise any divisions
20  aside from the tools division?
21  A.  Yes, they did.
22  Q.  What other divisions operated under that
23  facility?
24  A.  Pumps.
25  Q.  What does that mean?

## 13

1  A.  Pumps is a division within United Rentals now
2  called fluid solutions.
3  Q.  Okay.  Could you just --
4  A.  They.
5  Q.  -- articulate what that is, please?
6  A.  They provide different compressors and pumps
7  to different customer base to transfer liquid to and
8  from.
9  Q.  Do you have a counterpart safety director for
10  the pumps division?
11  A.  Yes, I do.
12  Q.  Who is that?
13  A.  That would be Cheryl Wisenbaker.
14  Q.  Where is she based?
15  A.  She is based in Beaumont, Texas.
16  Q.  How do you spell her last name?
17  A.  I believe it's W-i-s-e-n-b-a-k-e-r.
18  Q.  And she has responsibilities across the nation
19  like you do?
20  A.  Yes, she does.
21  Q.  Was she the nationwide pumps division safety
22  director as of 2017?
23  A.  Yes, she was.
24  Q.  Do you have to interact with her on a
25  day-in/day-out basis?

Michael Karabanoff - August 12, 2019

---

14

1    A.    Sometimes.
2    Q.    Could you explain the circumstances under
3    which you sometimes have to interact with her on a
4    day-in/day-out basis?
5    A.    Different initiatives that are taking place
6    where we have a co-located branch, we strategize to
7    complete them together as -- as one.
8    Q.    At the time of this incident, would Mr. --
9    strike.  New question.
10         At the time of this incident, who was
11   Mr. Ovalle's supervisor at the Canyon location?
12   A.    Art Silva.
13   Q.    Would you consider yourself to be a supervisor
14   of Mr. Silva?
15   A.    No.
16   Q.    Who is Mr. Silva's direct report?
17   A.    Carlos Ortegon.
18   Q.    Who was Mr. -- Ortegon?
19   A.    (Nods head)
20   Q.    Who was his direct report?
21   A.    Vice-president, David Scott, at the time.
22   Q.    What was Mr. Scott's job title?
23   A.    Vice-president.
24   Q.    Was it a vice-president of a certain division
25   or --

---

15

1    A.    Vice-president of power/HVAC division.
2    Q.    Who is Mr. Scott's direct report?
3    A.    That would be, at the time, Paul McDonald.
4    Q.    What was his job title?
5    A.    Senior vice-president over specialties.
6    Q.    Specialties?
7    A.    Yes.
8    Q.    Do you know who Mr. McDonald's direct report
9    was?
10   A.    Mr. McDonald would report, I believe at the
11   time, to Matt Flannery.
12   Q.    What was his job title?
13   A.    C.O.O. of United Rentals.
14   Q.    Did any of these employees we just
15   mentioned -- Mr. Silva, Mr. Ortegon, Mr. Scott,
16   Mr. McDonald -- did they have any direct reporting
17   responsibilities to you?
18   A.    Can you repeat the question?
19   Q.    Sure.  I'm trying to get a sense of the org --
20   the org chart, so to speak; and it looks like
21   Mr. Silva was the highest ranking United Rentals
22   employee at the Canyon facility -- is that fair -- at
23   the time of the incident?
24   A.    Correct.
25   Q.    He reported to Mr. Ortegon, true?

---

16

1    A.    Correct.
2    Q.    Where did Mr. Ortegon work?
3    A.    Mr. Ortegon was based out of Houston, Texas.
4    Q.    All right.  And Mr. Ortegon reported to
5    Mr. Scott?
6    A.    Correct.
7    Q.    Where did Mr. Scott work?
8    A.    Mr. Scott resides in Atlanta, Georgia.
9    Q.    And Mr. Scott reported to Mr. McDonald?
10   A.    Correct.
11   Q.    Where did Mr. McDonald work?
12   A.    Mr. McDonald worked at the corporate office in
13   Stamford, Connecticut.
14   Q.    You had supervisory responsibilities over
15   Mr. Silva insofar as they related to safety, correct?
16   A.    Yes.
17   Q.    You also had supervisory responsibilities
18   insofar as they related to safety over Mr. Ortegon,
19   right?
20   A.    Yes.
21   Q.    And Mr. Silva and Mr. Ortegon were sort of
22   working in tandem to fill the gap that was left by not
23   having a branch manager at the Canyon location, true?
24   A.    True.
25   Q.    And in -- in -- under normal circumstances,

---

17

1    you would have been supervising a -- a single person,
2    a branch manager, right?
3    A.    Repeat the question.
4    Q.    Sure.  If there had been a branch manager at
5    the Canyon location, that's the person to whom you
6    would have direct supervisory authority as it related
7    to safety, true?
8    A.    Not necessarily.  I would communicate with the
9    district manager, which would then funnel to the
10   branch manager.
11   Q.    Okay.  So, when you -- when you mentioned
12   district manager as it relates to Mr. Ortegon, which
13   geographic district does that cover?
14   A.    That covers, at the time, Texas.
15   Q.    So, Texas is big enough to gets its own
16   district, right?
17   A.    Correct.
18   Q.    All right.  Who do you report to?
19   A.    Josh Flores, vice-president of tool solutions
20   for United Rentals.
21   Q.    Where does Mr. Flores work?
22   A.    Mr. Flores resides in Houston, Texas.
23   Q.    Do y'all work at the same office or location?
24   A.    Yes.
25   Q.    Where is that?

---

**18**

1    A.   8787 Highway 225, La Porte, Texas.
2    Q.   La Porte?
3    A.   Yes.
4    Q.   Does Mr. Silva still work with the company?
5    A.   Yes.
6    Q.   What's his current title?
7    A.   I am not sure.
8    Q.   When's the last time you've spoken to
9 Mr. Silva?
10   A.   Don't recall.  Can't remember.
11   Q.   Has it been more than a year?
12   A.   Yes.
13   Q.   Okay.  What about Mr. Ortegon, what's his
14 current job title?
15   A.   Mr. Ortegon is no longer with the company.
16   Q.   Do you know where he is?
17   A.   I do not.
18   Q.   When's the last time you spoke with him?
19   A.   Sometime last year before he left.
20   Q.   Is it common for United Rentals' facilities
21 across America to have components of both the tools
22 division and what was formerly known as the pumps
23 division?
24   A.   It's not common, but it does occur.
25   Q.   Okay.  Is it more common for there to be a

**19**

1 dedicated facility to one versus the other?
2    A.   Depending on the market.
3    Q.   Okay.  Was it common to have facilities that
4 had both divisions in them in Texas in 2017?
5    A.   It was not -- it's not common but does occur.
6    Q.   Okay.  Other than the Canyon facility, can you
7 think of any other facilities in Texas in 2017 that
8 had both divisions operating out of them?
9    A.   Not off the top of my head.
10   Q.   Does Amarillo have a facility?
11   A.   I do not know.
12   Q.   Okay.  Is the Canyon facility still operating?
13   A.   I am not sure.  I am no longer the director
14 for power/HVAC.
15   Q.   But I thought you said that you've been the
16 supervisor -- or excuse me -- the safety director for
17 tools region since 2013, right?
18   A.   Correct.
19   Q.   What does power/HVAC have to do with that?
20   A.   Mr. Ortegon and Mr. Art work for the
21 power/HVAC division of United Rentals.  I work for
22 tool solutions at United Rentals.
23   Q.   Okay.
24   A.   At the time, I was overseeing power and tools.
25   Q.   Is it fair of me to say that the three

**20**

1 divisions within United Rentals in 2017 were power,
2 tools and pumps?
3    A.   Correct.
4    Q.   All right.  Why were you overseeing safety at
5 both tools and power back in 2017?
6    A.   It was a transition period while they were
7 hiring a director to oversee the power division.
8    Q.   Okay.  How long had you been overseeing safety
9 in both divisions as of 2017 and since then?
10   A.   I do not recall.
11   Q.   Do you have an estimate?
12   A.   Maybe six, seven months.
13   Q.   Did they eventually find someone to manage
14 safety over the power division?
15   A.   Correct.
16   Q.   When did that happen?
17   A.   That happened sometime in 2017.  Not sure.
18   Q.   And as of today, are there still three
19 distinct safety directors for each division --
20 division?
21   A.   Correct.
22   Q.   Is there a company-wide safety director?
23   A.   Yes.
24   Q.   Who is that?
25   A.   Teresa Kee now.

**21**

1    Q.   Could you spell the last name?
2    A.   K-e-e.  That's it.
3    Q.   Okay.  Where is she based?
4    A.   She is based in Chicago, Illinois.
5    Q.   Do you have to report to her?
6    A.   No.
7    Q.   Why not?
8    A.   I report to the vice-president of the region.
9    Q.   And then he reports to her?
10   A.   No.
11   Q.   Could you just explain how she fits into the
12 org chart with respect to safety reporting
13 requirements of three -- the three divisions?
14   A.   Our -- a director reports to the regional
15 vice-president, and we have a dotted line to corporate
16 safety.
17   Q.   What do you mean by "dotted line"?
18   A.   They funnel any corporate initiatives,
19 strategies to the directors to execute at the region
20 level.
21   Q.   So, if we were going to visualize this on an
22 org chart, the company-wide safety director would be
23 kind of parallel to you?
24   A.   No, because they are a corporate employee.  We
25 are regional employees.

**22**

1    Q.    Okay.  Could you explain the difference?
2    A.    The difference is that we're -- we oversee a
3    line of business; where they oversee the company as a
4    whole.
5    Q.    Okay.  Do you have to follow anything that
6    Ms. Kee decides to implement at the company when it
7    comes to safety?
8    A.    Yes, we do.
9    Q.    Okay.  Is she responsible for developing and
10   implementing the safety policies?
11   A.    Her team is.
12   Q.    Is it also based in Chicago?
13   A.    I'm not sure.
14   Q.    Who would be on her team?
15   A.    I believe there's a safety manager under her
16   and two other safety professionals that I -- I'm not
17   sure of their title.
18   Q.    Do you ever have to interact with her or any
19   of these people on a regular basis?
20   A.    Yes, to some extent.  The manager and Teresa,
21   I interact regularly.  The other two persons are
22   fairly new to the group.
23   Q.    So, Ms. Kee, the company-wide safety director,
24   and her team write the safety policies, right?
25   A.    Yes.

**23**

1    Q.    And they communicate those safety policies to
2    you, as a division safety director, right?
3    A.    Correct.
4    Q.    And then you are responsible for implementing
5    them on a regional level or division level, I should
6    say, right?
7    A.    Correct.
8    Q.    And then the branch managers are responsible
9    for implementing them on a branch level, right?
10   A.    Correct.
11   Q.    And you keep track of the safety records of
12   each branch, correct?
13   A.    No.
14   Q.    Who does that?
15   A.    The branch manager, the ops manager or the
16   service manager --
17   Q.    Okay.
18   A.    -- depending on who you report to at the
19   branch.
20   Q.    Do they report these metrics to you?
21   A.    Can you explain the question?
22   Q.    Sure.  I think I read in the documents we got
23   Friday that there's a incident reporting system of
24   incidents, near misses, things like that; and numbers
25   are kept so you can track the safety of each branch.

**24**

1    Does that sound familiar?
2    A.    Yes.
3    Q.    And I think you're saying that the branch
4    managers on sort of the boots-on-the-ground level are
5    responsible for keeping those metrics.  In other
6    words, if somebody makes a incident report, they're
7    supposed to notate that in the database, right?
8    A.    Not necessarily.
9    Q.    Okay.
10   A.    It is every employee's responsibility to log
11   in the near misses and report.  Every employee has
12   access to that system.
13   Q.    Right.  But the branch manager certainly would
14   be responsible for notating an incident if they became
15   aware of one, true?
16   A.    No.  The branch manager would, at that point,
17   instruct the employee who saw whatever he saw to input
18   in the system through his proprietary log-in in the
19   system.
20   Q.    Who is making sure the branch manager's doing
21   that?
22   A.    We review metrics on a biweekly basis to
23   ensure that there's activity in the system.
24   Q.    Who is "we"?
25   A.    It falls between the district manager, myself

**25**

1    to ensure that there's activity in the system.
2    Q.    Okay.  So, managers above the branch manager
3    are reviewing the branch manager's enforcement of the
4    incident reporting policies, right?
5    A.    Correct.
6    Q.    Okay.  And do you know what leading and
7    lagging indicators are?
8    A.    Yes.
9    Q.    What are those?
10   A.    A leading indicator is something that shows --
11   gives you an idea of what could occur, right?  It
12   paints you a picture.  Lagging indicator is after the
13   fact.
14   Q.    And these are safety metrics that are kept in
15   the industry to be able to make a company safer,
16   right?
17   A.    It's a tool that different companies use.
18   Q.    And the tool is designed to make the company
19   safer, right?
20   A.    The tool is made to raise awareness of the
21   conditions of certain behaviors, certain trends.  It's
22   to -- more to raise awareness.
23   Q.    Raise awareness about safety?
24   A.    Correct.
25   Q.    In order to make the company safer?

---

26

1    A.   Not necessarily.  It's more about -- it's an
2  educational tool for the employee.
3    Q.   Why would you want to raise awareness about
4  safety if you're not aiming to make the company safer?
5    A.   Can you repeat the question again?
6    Q.   Sure.  Why would you want to raise awareness
7  about safety using these leading and lagging
8  indicators if you're not trying to increase safety at
9  the company?
10        MR. WRIGHT:  Objection, form.
11   Q.   (BY MR. HAYNES)  You can answer.
12   A.   I don't think I'm understanding the question.
13   Q.   I'll just ask it again.  Why would you be
14  keeping this leading and lagging indicator data about
15  safety to raise awareness about safety at the company
16  if you're not trying to increase safety at the
17  company?
18        MR. WRIGHT:  Objection, form.
19   Q.   (BY MR. HAYNES)  You can answer.
20   A.   We are trying to, one, raise the awareness to
21  ensure that the employees are aware and they
22  understand the importance of hazard recognition and so
23  they understand to be able to have the opportunity to
24  either eliminate or mitigate certain hazards
25  associated with their task.

---

27

1    Q.   And that promotes safety of the company,
2  doesn't it?
3    A.   To some extent.
4    Q.   To what extent?
5    A.   The goal of the company is to ensure that the
6  employee goes home the same way he came to work.
7    Q.   To what extent does raising awareness about
8  safety of the company promote safety of the company?
9    A.   Say that one more time.
10   Q.   Yeah.  I'm just trying to understand your
11  answer.  I said -- I asked you if raising safety
12  awareness at the company promotes safety.  You said
13  "to some extent."  So, I'm trying to understand to
14  what extent.  So, to what extent does raising safety
15  awareness at the company promote safety of the
16  company?
17   A.   The company -- the attitude we take is we --
18  we raise awareness to ensure that the employee has
19  the -- the opportunity to recognize, eliminate,
20  mitigate the hazard.  So, we train the employee to
21  execute that, okay?  Now, the byproduct of that is a
22  safer environment, absolutely.
23   Q.   Could you give the jury an overview of your
24  educational background, please?
25   A.   I've been in the industry for 20 years, high

---

28

1  school graduate.  I have an associate's degree from
2  Lamar University in process operations.
3    Q.   Where did you go to high school?
4    A.   Thomas Jefferson in Port Arthur, Texas.
5    Q.   And you've been at United Rentals for ten
6  years?
7    A.   Correct.
8    Q.   What was your first job at United Rentals?
9    A.   I was a safety manager for a district in
10  Texas.
11   Q.   Which district in Texas?
12   A.   I believe at the time it was called Gulf
13  South.
14   Q.   Did that encompass Beaumont, Port Arthur and
15  Orange?
16   A.   Correct.
17   Q.   The Golden Triangle?
18   A.   Yes, sir.
19   Q.   Do you have any safety certifications?
20   A.   Some of my certifications have lapsed.  I was
21  a 40-hour trainer.  I was a -- I was trained in fire
22  and rescue through ExxonMobil.  That's lapsed.
23   Q.   ExxonMobil Baytown?
24   A.   ExxonMobil Baytown and ExxonMobil Beaumont.
25   Q.   Did you used to work there?

---

29

1    A.   Yes.
2    Q.   What did you do out there?
3    A.   I was -- in Beaumont I was a safety manager
4  for a construction firm inside Beaumont Exxon, and I
5  left there and was working for an engineering firm
6  based out of Baytown as a safety manager.
7    Q.   What kind of construction did y'all do in the
8  Exxon refineries or the plants?
9    A.   We executed running, maintain maintenance,
10  day-to-day operations.
11   Q.   What -- what was the name of the company?
12   A.   Triple S Industrial.
13   Q.   Is it based out of Beaumont?
14   A.   It is based out of Lumberton, Texas.
15   Q.   That's Beaumont area, right?
16   A.   Correct.
17   Q.   Do you currently hold any safety
18  certifications?
19   A.   No, I do not.
20   Q.   Are you certified in OSHA?
21   A.   Not currently.
22   Q.   Do you agree that OSHA applies to United
23  facilities across the United States?
24        MR. WRIGHT:  Objection, form.
25   A.   Yes.

30

1    Q.   (BY MR. HAYNES)  That includes the Canyon
2    facility on the day of this incident, right?
3        A.   Yes.
4        Q.   Do you know if this incident was reported to
5    OSHA?
6        A.   Yes.
7        Q.   Was it?
8        A.   Yes.
9        Q.   It was reported to OSHA?
10       A.   Yes.
11       Q.   Do you know who reported it to OSHA?
12       A.   I'm not sure.
13       Q.   Do you know when it was reported to OSHA?
14       A.   I believe it was reported after Mr. Ovalle --
15   we're required to report to OSHA once the employee has
16   been -- has stayed a day in the hospital.  We have to
17   report to OSHA.
18       Q.   Based upon your knowledge and experience at
19   the company, who at the company at that time would
20   have been responsible for notifying OSHA?
21       A.   I believe it would have been somebody in the
22   claims department.
23       Q.   What is the claims department?
24       A.   It's a corporate entity with United Rentals
25   that handles injury claims.

31

1        Q.   How do you know this was reported to OSHA?
2        A.   The protocol is that when an employee spends
3    the night at a hospital, once he's admitted, we -- we
4    report it to OSHA.
5        Q.   Right.  But how do you specifically know that
6    this incident was reported?
7        A.   Because of protocol.
8        Q.   Do you have specific personal knowledge that
9    this incident was reported to OSHA?
10       A.   No, I do not.
11       Q.   You're assuming it was based on what you would
12   expect the protocol to be?
13       A.   Correct.
14       Q.   Is it protocol for the claims department to
15   report incidents to OSHA?
16       A.   Yes, unless they delegate.
17       Q.   Do you have to interact with the claims
18   department as part of your job?
19       A.   Sometimes.
20       Q.   Could you just give us some examples of under
21   which circumstances you would?
22       A.   I interact with the claims department when
23   they need different information of the employee,
24   location, time.
25       Q.   All right.  So, the claims departments

32

1    investigate personal injury claims on behalf of United
2    Rentals?
3        A.   Not to my knowledge.
4        Q.   Well, you said they handled P.I. claims,
5    right?
6        A.   Correct.  They --
7        Q.   What --
8        A.   They process the claim.
9        Q.   Okay.  Who investigates the claims?
10       A.   I'm not sure.
11       Q.   Does safety investigate personal injury
12   claims?
13       A.   I'm not sure I'm understanding the question.
14       Q.   Let me ask it this way.  Was the incident with
15   Mr. Ovalle investigated by United Rentals?
16       A.   A report was filled about the -- of what
17   occurred.  So, yes.
18       Q.   What do you mean by "a report was filled"?
19       A.   So, we gathered the facts of what occurred;
20   and we submitted the -- the report in the system.
21       Q.   Who is "we"?
22       A.   It was collaboration between myself and the
23   ops manager.
24       Q.   What is "the system"?
25       A.   United Rentals Safety System.

33

1        Q.   Is that a company-wide database?
2        A.   Correct.
3        Q.   And you can access it from your computer, I
4    assume?
5        A.   Correct.
6        Q.   Can people up in Canyon access it?
7        A.   Yes.
8        Q.   What did United Rentals do to gather the facts
9    of what occurred?
10       A.   We interviewed multiple employees, talked to
11   Mr. Ovalle; and that was the extent of the
12   investigation.
13       Q.   When did this investigation commence?
14       A.   The report was filled roughly about a week
15   after the incident occurred.
16       Q.   Who did you interview?
17       A.   Art Silva, the ops manager; Mr. Ovalle; and a
18   technician from the pump site.  I'm not sure of his
19   name.
20       Q.   Who conducted the interviews?
21       A.   Myself.
22       Q.   Was it in person or over the phone?
23       A.   Over the phone.
24       Q.   Did you take notes of what you -- what was
25   said during the interviews?

---

**34**

1   A.   Yes, and it was posted on the report.  The
2   notes allowed me to fill out the report accordingly.
3   Q.   When you took the notes, how were you taking
4   them?
5   A.   Paper and pen.
6   Q.   What happened to the paper?
7   A.   Once I used that pad to guide me to fill out
8   the incident report, that was it.
9   Q.   You discarded the paper?
10  A.   I don't recall.
11  Q.   Do you know where it is right now?
12  A.   No.
13  Q.   Was it accepted protocol at the time to take
14  written notes of employee interviews and then discard
15  them as part of an investigation United Rentals was
16  conducting?
17  A.   I was taking notes and ensuring that I
18  captured the notes to input into the system.
19  Q.   Was it part of normal protocol at United
20  Rentals at the time to take handwritten notes of
21  employee interviews as part of an incident
22  investigation and then discard them?
23  A.   I am not sure.
24  Q.   Were you ever trained or educated about what
25  the protocol was?

---

**35**

1   A.   I was trained on how to fill out the report in
2   the system, yes.
3   Q.   What did they tell you to do?
4   A.   They walked us through the process.  There was
5   a third party that manages the system that trained all
6   the safety directors on how to use the system.
7   Q.   Who was the third party?
8   A.   I believe the name of the company is A.I.C.
9   Q.   Do you know what that stands for?
10  A.   I do not.
11  Q.   Do you know where they're based?
12  A.   I believe in California.
13  Q.   Where did the training take place?
14  A.   In Houston and another one in Dallas.
15  Q.   And for an incident like this, would the
16  division safety director be responsible for filling
17  out this report?
18  A.   Not all the time.
19  Q.   Okay.  But you did in this case, right?
20  A.   Correct.
21  Q.   Why?
22  A.   Because at the time, there was no branch
23  manager at that location.
24  Q.   Assuming there would have been a branch
25  manager, would he or she have been expected to fill

---

**36**

1   out this kind of report?
2   A.   Correct.
3   Q.   All right.  Why didn't the regional director
4   do it?
5   A.   I don't -- I'm not following your question.
6   Q.   I'm sorry.  There's just been a lot of names
7   today so far.  Mr. Ortegon, he's the district manager,
8   true?
9   A.   Correct.
10  Q.   And he was at the time of this incident,
11  right?
12  A.   Correct.
13  Q.   Why would he not be responsible for filling
14  out the incident report?
15  A.   Typically it's outlined to the branch manager.
16  Q.   Okay.  Why wouldn't Mr. Silva have filled it
17  out at this time?
18  A.   Mr. Silva at the time, I believe, was not
19  present.
20  Q.   Present to witness the incident or present to
21  fill out the report?
22  A.   He was not at the Canyon location at the time.
23  Q.   Meaning, he wasn't working at the Canyon
24  facility, just as a general proposition?
25  A.   He was, I believe, in either a meeting or

---

**37**

1   training for United Rentals but not at the Canyon
2   facility.
3   Q.   Okay.  How long was this report?  How many
4   pages?
5   A.   There's a template in the -- in the system
6   that you go through, and it's -- there's about four or
7   five tabs that you fill out --
8   Q.   Okay.
9   A.   -- that ask specific questions.
10  Q.   Were any photographs taken as a result of this
11  investigation or through this investigation?
12  A.   Not to my knowledge.
13  Q.   Why not?
14  A.   I'm not sure.
15  Q.   Is it part of the ordinary course of business
16  for United Rentals to take photographs pursuant to an
17  investigation of an injury-causing incident that was
18  eventually reported to OSHA?
19  A.   It's to the discretion of the person that's
20  doing the investigation.
21  Q.   Is that what the policy is of the company?
22  A.   If there's a policy, I'm not aware of it.
23  Q.   You're not aware of what the incident
24  reporting policy is for United Rentals?
25  A.   Yes, but it doesn't specify picture taking.

---

38

1    Q.    Are you sure about that?
2    A.    To my knowledge.
3    Q.    Do you know if OSHA did a site visit?
4    A.    No, they did not.
5    Q.    How do you know that?
6    A.    They would have notified either myself,
7    corporate or the pump safety director if they did.
8    Q.    Do you know if United Rentals conducted what's
9    known as a self-reporting exercise with OSHA with
10   respect to this incident?
11   A.    No, I do not.
12   Q.    Do you know what a self-reporting exercise is
13   for OSHA?
14   A.    No, I do not.
15   Q.    What did you do to get ready for your
16   deposition today?
17   A.    I talked to my lawyer, the lawyer.
18   Q.    Anything else?
19   A.    I looked over the incident, some documents.
20   Q.    When did you meet with the lawyer?
21   A.    I don't recall.  It was sometime last month, I
22   believe, or this month.  I'm not sure.
23   Q.    Was it Friday?
24   A.    No.
25   Q.    Was it yesterday?

39

1    A.    No.
2    Q.    Was it last week?
3    A.    Two weeks ago maybe or the beginning of the
4    month.
5    Q.    What kind of documents did you look at?
6    A.    I looked at documents that were provided by --
7    by the lawyer.  I'm not sure what to call them.  Just
8    took a look at what -- what they gave me and kind of
9    had an overview.
10   Q.    Did you look at any other documents that were
11   generated by United Rentals?
12   A.    Yes.
13   Q.    Which ones?
14   A.    Some of the training documents.
15   Q.    Could you just be more specific about what
16   they were?
17   A.    Basically there were some training documents
18   that took place or that take place on a monthly basis
19   for all employees covering different topics.
20   Q.    Toolbox talks?
21   A.    No.  These are monthly trainings.  The toolbox
22   talks are completely different.
23   Q.    What are those?
24         MR. WRIGHT:  Objection to form.
25   A.    The morning huddles take place at the

40

1    beginning of a shift typically, and there's a series
2    of different topics that are covered on a daily basis.
3    Q.    (BY MR. HAYNES)  Okay.  Other than training
4    documents, what else did you look at?
5    A.    I believe that's it.  Some of the questions, a
6    document that looks similar to this, whatever that's
7    called.
8    Q.    Interrogatories?
9    A.    I'm not sure what they're called.
10   Q.    Okay.  And you looked at -- did you look at
11   any photographs?
12   A.    Yes, it was part of the documents that were in
13   there.
14   Q.    Which photographs?
15   A.    There was a couple of pictures of the bay that
16   we looked at.  There's a picture of Ovalle with Art,
17   and I believe that's it.
18   Q.    "Ovalle with Art," what do you mean by that?
19   A.    There was a picture that -- that I saw that
20   was in the -- in the pile of paperwork that was given
21   to me.
22   Q.    I understand.  What I'm saying is, what do you
23   mean by "Ovalle with Art"?  Could you just define what
24   that means?
25   A.    Yes.  There was a picture that was with

41

1    Mr. Ovalle and Art.
2          MR. WRIGHT:  Silva.
3    A.    Silva.
4    Q.    (BY MR. HAYNES)  What were they doing?
5    A.    They just took a picture while Mr. Ovalle was
6    in the hospital.
7    Q.    Okay.  Anything else you looked at?
8    A.    No.  I believe that's it.
9    Q.    Do you have to use e-mail as part of your job?
10   A.    Yes.
11   Q.    Do you have like a United Rentals e-mail
12   address?
13   A.    Yes.
14   Q.    That ends in ur.com?
15   A.    Yes.
16   Q.    Did you ever send or receive any e-mails about
17   this incident?
18   A.    Yes, I'm sure.
19   Q.    Do people at the facility, the Canyon
20   facility, do they have e-mail addresses --
21   A.    Yes.
22   Q.    -- for United Rentals?
23         Did they have to send and receive
24   e-mails as part of their jobs?
25   A.    Yes.  Some of them, it's not part of their

## 42

1  job; but sometime -- it's the way they communicate
2  from either branch to branch or --
3      Q.  Uh-huh.
4      A.  -- whatnot.
5      Q.  Okay.  Does the company send out e-mails like
6  safety bulletins and things like that?
7      A.  Yes.
8      Q.  How often does that happen?
9      A.  That happens once a week.  They sent out the
10  morning huddles for that week.
11     Q.  So, a morning huddle is a safety-oriented
12  document generated by United Rentals that it sends out
13  to its employees every week, right?
14     A.  Correct.
15     Q.  And it covers various safety topics, true?
16     A.  Correct.
17     Q.  Does United Rentals have an H.S.E. manual?
18     A.  Yes, they do.
19     Q.  Is that something that the employees are
20  expected to know and follow?
21     A.  Yes.  And it's available to them in the
22  system.
23     Q.  Are they trained on it?
24     A.  Yes.
25     Q.  When do they get training on it?

## 43

1      A.  As part of their orientation, they're
2  covered -- the topics are covered during their
3  orientation, and they have access to the policies and
4  procedures if they have any questions.
5      Q.  Okay.  And the branch managers are expected to
6  enforce those policies on the branch level, right?
7      A.  Correct.
8      Q.  And they have to supervise their employees to
9  make sure they are following the policies, don't they?
10     A.  Correct.
11     Q.  And United Rentals has an obligation to
12  provide a safe workplace, doesn't it?
13     A.  Yes.
14     Q.  And it does that in various ways, one of which
15  is having sufficient policies that the employees
16  understand, know and follow, right?
17     A.  Can you repeat the question?
18     Q.  Sure.  One of the ways that United Rentals
19  provides a safe workplace is by having safety policies
20  that are sufficient and adequate, right?
21     A.  Correct.
22     Q.  And those safety policies have to be
23  communicated to the employees, right?
24     A.  Correct.
25     Q.  And those safety policies have to be -- the

## 44

1  adherence to those safety policies has to be monitored
2  by United Rentals, right?
3      A.  Correct.
4      Q.  Will you please take a look at Exhibit 1.
5  It's right there in front of you.
6      A.  (Complies)
7      Q.  Have you seen this before?  It's got a couple
8  pages.  You can look through it.
9      A.  Yes.
10     Q.  So, this is a true and accurate copy of the
11  Notice of Deposition we've served in this case; and
12  it's got a series of topics on the last page.  Do you
13  see that?
14     A.  Yes.
15     Q.  All right.  And technically this is a
16  deposition of United Rentals as a company and the way
17  that works is we send a notice with topics and the
18  company is here being deposed today on those topics
19  through an individual.  Do you understand that?
20     A.  Yes.
21     Q.  And you are that individual, right?
22     A.  Correct.
23     Q.  So, you're here speaking on behalf of the
24  company, right?
25     A.  Understood.

## 45

1      Q.  And this exhibit contains 11 discreet topics.
2  Do you see that?
3      A.  Yes.
4      Q.  Are you prepared to talk about these topics?
5      A.  Yes.
6      Q.  Do you know of any topic on this list that you
7  would not be able to discuss here today?
8      A.  Can I take a minute to overlook it?
9      Q.  Sure.
10     A.  I am not familiar with No. 5.
11     Q.  No. 5 is "The construction/installation and
12  maintenance/repair history of the drain/sump outside
13  the generator shop where the incident occurred,"
14  right?
15     A.  Right.
16     Q.  Do you know anybody at the company that would
17  know about that?
18     A.  Maybe our facilities group.
19     Q.  Okay.  Is that another division?
20     A.  It's an entity within United Rentals that
21  helps with the leases.
22     Q.  Okay.  Who is in the facility -- I mean --
23  strike.  New question.
24         Is there anybody in the facilities group
25  that works in Houston?

46

1    A.    I'm not sure where they work at.
2    Q.    Do you ever have to interact with them?
3    A.    Sometimes.
4    Q.    Okay.  Under what circumstances?
5    A.    When we set up maybe a cold start, if there's
6    a certain issue with trying to get different equipment
7    in the area based on the size of the location, various
8    things; but they -- they're assigned a certain area,
9    and they're scattered all over the U.S.
10   Q.    Wouldn't you expect somebody that worked at
11   the facility to have some idea about the maintenance
12   and repair history of that sump outside?
13   A.    Can you repeat that?
14   Q.    Sure.  Wouldn't you expect somebody that
15   actually worked at the Canyon facility for United
16   Rentals to have some idea about the maintenance and
17   repair history of the sump?
18              MR. WRIGHT:  Objection, form.
19   A.    I'm not -- I wouldn't -- I'm not sure.
20   Q.    (BY MR. HAYNES)  I mean, how long had United
21   Rentals been at that Canyon facility?  Do you know?
22   A.    I am not sure how long they've been there.
23   Q.    But you expect your employees at a particular
24   branch to have some knowledge of equipment on the
25   facility that would affect drainage and -- and -- and

47

1    other items that would affect whether a floor was
2    slippery, right?
3    A.    If there was an issue, yes.
4    Q.    Okay.  So, would that be something that you'd
5    expect Mr. Silva and Mr. Ortegon to be aware of?
6    A.    Yes.
7    Q.    Certainly if one of the employees was
8    complaining about a problem with the drainage, with
9    rainwater seeping inside the facility, that's
10   something that you would expect the branch managers or
11   whoever was filling that role at the time to take
12   seriously, right?
13   A.    Yes.
14   Q.    You would expect them to fill out an incident
15   report about that, right?
16              MR. WRIGHT:  Objection to form.
17   A.    The employee would fill out the near miss or
18   the stop work or the good catch in the system.
19   Q.    (BY MR. HAYNES)  Okay.  Would you expect the
20   branch manager or whoever was filling that role to
21   have any responsibility for taking a complaint
22   seriously by an employee if there was a water seepage
23   problem inside the building from rainwater outside of
24   it?
25   A.    If there was an issue, yes.

48

1    Q.    What would you expect them to do?
2    A.    I would expect them to have a conversation and
3    help either eliminate or mitigate a potential hazard.
4    Q.    In fact, you expect the branch managers or
5    whoever's filling that particular role at the time to
6    conduct ongoing hazard analysis of a facility, right?
7    A.    As well as the employees, yes.
8    Q.    Right.  But it's certainly in -- I mean,
9    branch managers are employees of United Rentals, true?
10   A.    Correct.
11   Q.    I mean, you cannot completely pass off the
12   responsibility to maintain a safe workplace to the
13   lowest level employees, can you?
14   A.    No.  The employees' responsibility is to
15   assess their work area prior to then -- them engaging
16   in the task at hand.
17   Q.    And you agree that it is up to management's
18   responsibility to ensure the employees are doing that,
19   right?
20   A.    Correct.
21   Q.    And it's management's responsibility to make
22   budgeting decisions or make more significant executive
23   decisions about changing the way a facility is
24   designed if a problem with that design is brought to
25   their attention, right?

49

1    A.    Correct.
2    Q.    A boots-on-the-ground employee, a technician,
3    for example, can't make the decision to modify a drain
4    or sump outside a building, right?
5    A.    Correct.
6    Q.    That's above that employee's head, true?
7    A.    Correct.
8    Q.    And you agree that rainwater seeping into a
9    United Rentals facility onto a painted floor can
10   create a hazard, right?
11   A.    Potentially, yes.
12   Q.    That can be dangerous, can't it?
13   A.    Can you explain a little bit?
14   Q.    Sure.  Do you agree that rainwater seeping
15   into a United Rentals facility, where it has a painted
16   floor, can be dangerous?
17   A.    Potentially, yes.
18   Q.    Someone could slip on it and fall and hurt
19   themselves, right?
20   A.    Correct.
21   Q.    And that's something that United Rentals needs
22   to be aware of and to try to fix or mitigate against,
23   right?
24   A.    Correct.
25   Q.    Do you agree that United Rentals' No. 1

50

1  priority has to be safety?
2      A.    Safety is a value, not a priority.  Priorities
3  change.
4      Q.    Okay.  Is United Rentals' top priority safety?
5      A.    Again, it's a value.  It's not a priority.
6  Priorities change.  Safety doesn't.
7      Q.    So, safety is something so important that we
8  can't even call it a priority.  It's beyond a
9  priority.  It's a value, right?
10     A.    It's a value.
11     Q.    All right.  Does that mean it's more important
12  than a priority?
13     A.    Yes.
14     Q.    Okay.  And you should be proactive rather than
15  reactive when it comes to safety at United Rentals,
16  right?
17     A.    That is the goal, to be proactive, not
18  reactive.
19     Q.    That's why you analyze leading indicators,
20  right?
21     A.    Correct.
22     Q.    In fact, OSHA recommends that you evaluate
23  leading indicators, doesn't it?
24     A.    Yes.
25     Q.    United Rentals also has a responsibility to

51

1  provide its employees with the proper tools and
2  equipment to do their job safely, correct?
3      A.    Correct.
4      Q.    United Rentals also has responsibility to
5  provide its employees with tools and equipment that
6  will help them do their job safely, if they have
7  requested it, right?
8      A.    Correct.
9      Q.    United Rentals also has an obligation to take
10  all safety complaints, safety issues, safety problems
11  seriously that its employees bring to it, right?
12     A.    Correct.
13     Q.    And it does do that, doesn't it?
14     A.    Yes.
15     Q.    United Rentals also has a responsibility to
16  train its employees on safety policies, right?
17     A.    Correct.
18     Q.    If United Rentals has safety policies that it
19  does not enforce, that's like not having safety
20  policies at all, correct?
21     A.    Repeat that again.
22     Q.    Sure.  If United Rentals has safety policies
23  that it doesn't enforce at all, that's like not even
24  having safety policies, right?
25     A.    The policy should be enforced.

52

1      Q.    Right.  And if you don't, that's like not even
2  having a policy at all, right?
3      A.    The policies exist.  They're there.  They
4  should be enforced.
5      Q.    Right.  But they're useless if they're not
6  enforced, right?
7      A.    Correct.
8      Q.    Part of United Rentals' obligation to provide
9  a safe workplace is to take all reasonable measures to
10  prevent slips and trips at their facilities, right?
11          MR. WRIGHT:  Objection, form.
12     A.    It's our job to ensure that we, again, try to
13  eliminate or mitigate any potential hazard that
14  exists.
15     Q.    (BY MR. HAYNES)  Are slips and trips a
16  potential hazard?
17     A.    Yes.
18     Q.    So, part of the company's obligation to
19  provide a safe workplace is to take reasonable
20  measures to prevent slips and trips, right?
21     A.    Correct.
22     Q.    They should provide slip protection or trip
23  protection, right?
24     A.    Correct.
25     Q.    It also has to provide adequate lighting for

53

1  its employees to work in, right?
2      A.    Correct.
3      Q.    Does United Rentals require its employees to
4  conduct job safety analysis?
5      A.    Yes.
6      Q.    What is a job safety analysis?
7      A.    It's J.H.A.  We also perform a 360 hazard
8  awareness, which is a form of a mental J.H.A. prior to
9  them starting their task.
10     Q.    You're saying "J.H.A."?
11     A.    Uh-huh.
12     Q.    Yes?
13     A.    Yes.
14     Q.    Have you ever heard it referred to as J.S.A.?
15     A.    Yes.
16     Q.    Okay.  But at United Rentals, y'all refer to
17  it as J.H.A.?
18     A.    Yes.
19     Q.    Okay.  And J. -- I'll call it J.H.A.  J.H.A.
20  is -- sometimes people use that term to describe the
21  actual form you fill out, which is supposed to reflect
22  you actually doing the J.H.A.  Do you understand what
23  I mean by that?
24     A.    Yes.
25     Q.    Does United Rentals require its employees to

54

1  fill out the J.H.A. forms?
2      A.   No.
3      Q.   Why not?
4      A.   They are trained in identifying the hazards
5  with the 360 process, which is a mental J.H.A.  When
6  the employee is dealing with a task that it's complex,
7  a field -- a J.H.A. -- a field J.H.A. is filled out
8  for that process.
9      Q.   So, the more complex the process at hand, the
10 more of an obligation the employee has to fill out the
11 J.H.A. form?
12     A.   They go through the steps, their work steps
13 and list down the associated hazards.
14     Q.   If it's more complex?
15     A.   Correct.
16     Q.   But if it's more routine, they don't?
17     A.   They do a form of a J.H.A.; but they don't
18 have to fill out the form, which is a 360 hazard
19 awareness.
20     Q.   What is a 360 hazard awareness?
21     A.   360 hazard awareness is a -- it's a last
22 risk -- a last-minute risk assessment prior to the
23 employees commencing their task.  It's a form of a
24 J.H. -- a mental J.H.A.
25     Q.   Okay.  How does United Rentals track whether

55

1  or not its employees are conducting these mental
2  J.H.A.s?
3      A.   We -- again, on our monthly and our daily
4  huddles, it's covered.  It's trained to our employees.
5  It's part of the orientation.  It's part of the
6  process of you doing your job.
7      Q.   Any other ways?
8      A.   No.
9      Q.   Are the branch managers required to undergo
10 periodic performance evaluations by United Rentals?
11     A.   Yes.
12     Q.   How often?
13     A.   Twice a year.
14     Q.   Who conducts those?
15     A.   Their direct report.  Whoever they report
16 directly to.
17     Q.   Are you --
18     A.   Typically it would be a district manager.
19     Q.   Do you have any responsibilities for these
20 evaluations?
21     A.   No, I do not.
22     Q.   Do you ever become aware of them?
23     A.   No, I do not.
24             MR. HAYNES:  Take a rest room break?
25             MR. WRIGHT:  Please.

56

1              THE VIDEOGRAPHER:  Off the record,
2  11:13.
3              (Karabanoff Exhibit No. 2 was marked)
4              THE VIDEOGRAPHER:  The time is 11:27,
5  back on the record.
6      Q.   (BY MR. HAYNES)  Ready to keep going?
7      A.   Yes.
8      Q.   All right.  I hand you Exhibit 2.  Do you
9  recognize that?
10     A.   Yes.
11     Q.   What is that?
12     A.   This is part of our monthly training.
13     Q.   Okay.  Is this a true and accurate copy of
14 Monthly Training issued by United Rentals in January
15 of 2017, true?
16     A.   Correct.
17     Q.   And the highlighted portions are mine, okay?
18 I made the highlights, just for the record.
19         So, if you look at the top right, it
20 says, "Real Life Safety Monthly Training Toolbox,"
21 true?
22     A.   True.
23     Q.   So, United Rentals does have a toolbox
24 training that happens every month, right?  Is that
25 fair?

57

1      A.   The toolbox topics are provided on a daily
2  basis.
3      Q.   All right.  What about the monthly ones that
4  this document's talking about?
5      A.   Yes, these are just topics that are covered
6  within the document; but the actual toolbox, what they
7  call toolbox --
8      Q.   Uh-huh.
9      A.   -- are our morning huddles that take place on
10 a daily basis.
11     Q.   Okay.  And when you refer to the toolbox, the
12 huddle, are you talking about the actual event itself
13 or is there paperwork that goes with it or is it both?
14     A.   Both.
15     Q.   Okay.  So, every morning each facility is
16 supposed to be filling out these toolbox huddle --
17     A.   Correct.
18     Q.   -- sessions?  Okay.
19         And that was true and applied to the
20 Canyon facility in 2017?
21     A.   Correct.
22     Q.   All right.  So, this says that "Safety is a
23 Core Value" at United Rentals, right?
24     A.   Yes.
25     Q.   So, you agree that safety is a core value at

58

1  United Rentals, right?
2      A.   Yes.
3      Q.   It says, "Making safety a part of everything
4  we do is not a slogan at United Rentals.  It's part of
5  who we are, how we operate and what we believe in,"
6  right?
7      A.   Right.
8      Q.   So, safety is not just a slogan at United
9  Rentals, is it?
10     A.   No.
11     Q.   It's part of who United Rentals is and how you
12 operate, true?
13     A.   True.
14     Q.   At United Rentals you emphasize watching out
15 for the safety of others, right?
16     A.   True.
17     Q.   At United Rentals you emphasize and require
18 people to take action for reporting and eliminating
19 hazards, right?
20     A.   True.
21     Q.   And in the -- kind of the middle down the
22 page, I highlighted a section in the paragraph; and
23 I'm just going to read it and ask you some questions
24 about it.  It says, "Whether or not you are or your
25 branch experienced an injury last year, no one is safe

59

1  without a 24/7 commitment to safety.  All employees
2  are expected to constantly look for and correct
3  hazards before and during all work tasks, especially
4  when operating equipment and vehicles," right?
5      A.   Right.
6      Q.   So, do you agree that all employees are
7  expected to look -- to constantly look for and correct
8  hazards before and during all work tasks, right?
9      A.   Right.
10     Q.   And that's not just low-level employees or --
11 or technicians.  That's management, also, right?
12     A.   United Rentals employees, yes.
13     Q.   Further down the page I've highlighted the
14 section that says, "As a manager, that's a very
15 important concept.  If you embrace safety, then your
16 team will embrace safety."  And it's interviewing a
17 manager, right?
18     A.   Right.
19     Q.   Do you agree that if you embrace safety as a
20 manager at United Rentals, that your team will embrace
21 safety?
22     A.   Yes.
23     Q.   If you go to the second page, please.  There's
24 a section here -- this is generally in the section
25 called resolving to avoid safety shortcuts.  Do you

60

1      see that?
2      A.   Uh-huh, yes.
3      Q.   And at the bottom left, it's talking about
4  poor housekeeping, right?
5      A.   Right.
6      Q.   Housekeeping basically means keeping your work
7  area safe and clean, right?
8      A.   Right.
9      Q.   That would include making sure that there's no
10 substances on the floor that could create a slip or a
11 trip, right?
12     A.   Right.
13     Q.   And that's an important part of United
14 Rentals' dedication to maintaining a safe workplace,
15 right?
16     A.   Right.
17     Q.   To developing policies and procedures that
18 promote good housekeeping, right?
19     A.   Right.
20     Q.   And monitoring its employees' adherence to
21 those policies, right?
22     A.   Right.
23     Q.   And enforcing those policies, right?
24     A.   Right.
25     Q.   Do you agree that if United Rentals does not

61

1  enforce those policies, that people can get hurt?
2      A.   Explain that one more time.
3      Q.   Sure.  If United Rentals does not enforce its
4  policies regarding good housekeeping, that people can
5  get hurt?
6      A.   There is a personal responsibility by everyone
7  to ensure that those rules or processes or procedures
8  are followed.  So, there's a personal commitment from
9  every single employee, regardless of --
10     Q.   If United Rentals doesn't enforce its policies
11 regarding good housekeeping, people can get hurt,
12 can't they?
13          MR. WRIGHT:  Objection to form.
14     Q.   (BY MR. HAYNES)  You can answer.
15     A.   There's a probability that somebody could get
16 hurt.
17     Q.   And on the right-hand side of the page, it's
18 called -- there's a list called "Life Safety Rules."
19 Do you see that?
20     A.   Yes.
21     Q.   It says, "Recognize and report all incidents
22 to include near misses immediately," right?
23     A.   Right.
24     Q.   United Rentals expects all employees to
25 recognize and report all incidents immediately,

---

**62**

1  correct?
2  **A.  Correct.**
3  **Q.  That includes every single employee, including**
4  **the managers, right?**
5  **A.  Correct.**
6  Q.  All right.
7  (Karabanoff Exhibit No. 3 was marked)
8  Q.  (BY MR. HAYNES)  I hand you Exhibit 3.  Do you
9  recognize this?
10  **A.  Yes.**
11  Q.  What is this?
12  **A.  This is another monthly training.**
13  Q.  It's another true and accurate copy of a
14  Monthly Training Toolbox issued by United Rentals.
15  This one's dated August of 2016, correct?
16  **A.  Correct.**
17  Q.  This is talking about the Hazard 360 concept
18  you mentioned earlier, right?
19  **A.  Correct.**
20  Q.  And it's emphasizing the need for "Situational
21  Awareness," right?
22  **A.  Right.**
23  Q.  And I've highlighted some sections.  So, I'm
24  going to talk about the first one highlighted in kind
25  of the middle of the page.  It says, "We need to

---

**63**

1  properly recognize and control workplace hazards in
2  order to prevent accidents, injuries and near misses.
3  It begins with knowing the policies and procedures of
4  doing a particular task or operating a certain piece
5  of equipment.  Never do a task or operate a piece of
6  machinery if you haven't been properly trained to do
7  so."  Did I read that correctly?
8  **A.  Yes.**
9  Q.  All right.  So, United Rentals has an
10  obligation to its employees to properly recognize and
11  control workplace hazards so it can prevent accidents
12  and injuries, right?
13  **A.  Say that one more time.**
14  Q.  United Rentals has an obligation to its
15  employees to properly recognize and control workplace
16  hazards so it can prevent accidents and injuries,
17  correct?
18  **A.  Correct.**
19  Q.  And one of the ways it does that is by
20  ensuring that its employees know the policies and
21  procedures of doing a particular task, right?
22  **A.  Correct.**
23  Q.  Because if you know the policies and
24  procedures of doing a particular task, you know how to
25  mitigate the hazards of doing that task, right?

---

**64**

1  **A.  Correct.**
2  Q.  If you go a little bit further down the page
3  in that column, it says, "We all know that you need a
4  plan -- you need to plan your work.  This includes
5  your route to the job site and the path you may have
6  to take, once you start a task.  Always ask yourself,
7  'Have I identified the possible hazards I may face;
8  and do I know what I will do if something goes
9  wrong?'"  Did I read that right?
10  **A.  Correct.**
11  Q.  United Rentals emphasizes the importance of
12  planning work, right?
13  **A.  Right.**
14  Q.  It emphasizes the importance of having
15  policies and procedures for work tasks, right?
16  **A.  Right.**
17  Q.  And if it doesn't have adequate policies and
18  procedures for work tasks, it is not providing a safe
19  workplace, is it?
20  MR. WRIGHT:  Objection, form.
21  **A.  Not necessarily.**
22  Q.  (BY MR. HAYNES)  What do you mean by your
23  answer?
24  **A.  Every job site may be a little bit different.**
25  **We train our employees to have that keen eye to**

---

**65**

1  **recognize those hazards.  Again, help eliminate or**
2  **mitigate or empower them to stop what they're doing if**
3  **there's a concern or they're not sure of what they're**
4  **fixing to get into.**
5  Q.  If United Rentals has nonexistent or
6  inadequate safety policies, that's unsafe, isn't it?
7  MR. WRIGHT:  Objection, form.
8  **A.  Say that one more time.**
9  Q.  (BY MR. HAYNES)  If United Rentals has
10  nonexistent or inadequate safety policies, that's
11  unsafe, isn't it?
12  MR. WRIGHT:  Objection, form.
13  **A.  I'm not sure I'm understanding the question.**
14  Q.  (BY MR. HAYNES)  Do you know what inadequate
15  means?
16  **A.  Yes.**
17  Q.  Do you know what nonexistent means?
18  **A.  Yes.**
19  Q.  Do you know what safety policies are?
20  **A.  Yes.**
21  Q.  Do you know what unsafe means?
22  **A.  Yes.**
23  Q.  So, if United Rentals has nonexistent or
24  inadequate safety policies, that's unsafe, correct?
25  MR. WRIGHT:  Objection, form.

Michael Karabanoff - August 12, 2019

66

```
1       A.   No.  The employees are trained to ensure that
2   they recognize those hazards and bring them forward to
3   ensure that we come up with a plan to, again,
4   eliminate or mitigate those hazards.
5       Q.   (BY MR. HAYNES)  United Rentals has an
6   obligation to have adequate safety policies, right?
7       A.   Correct.
8       Q.   If it doesn't have adequate safety policies,
9   that's unsafe, isn't it?
10           MR. WRIGHT:  Objection, form.
11      A.   No, I don't agree.
12      Q.   (BY MR. HAYNES)  So, you disagree that if
13  United Rentals has inadequate safety policies, that
14  it's unsafe?
15           MR. WRIGHT:  Objection, form.
16      A.   Because I'm confused with the question.
17      Q.   (BY MR. HAYNES)  What's confusing about it?
18      A.   Because a policy's a policy.  The actual work
19  task that the employee engages is what potentially
20  could get him hurt.
21      Q.   What if there was no policy or it was
22  inadequate, couldn't that also get him hurt?
23      A.   But there's other procedures that are in place
24  that either stop the employee from doing what he's
25  fixing to do --
```

67

```
1       Q.   Uh-huh.
2       A.   -- or help eliminate the hazards that they're
3   seeing.
4       Q.   Is it acceptable to United Rentals to have
5   inadequate safety policies?
6       A.   No.
7            MR. WRIGHT:  Objection, form.
8       Q.   (BY MR. HAYNES)  Why is it not acceptable?
9       A.   It's not acceptable because it should be part
10  of the process, of the work process.  Now, if there's
11  a step or a condition that may be new because of
12  different job site or something that an employee comes
13  and brings forth to the table, then we put a plan
14  together to either, again, eliminate or mitigate that
15  hazard for the employee.
16      Q.   Okay.  So, it's not acceptable to United
17  Rentals to have inadequate safety policies?
18      A.   Correct.
19      Q.   Because United Rentals values safety, right?
20      A.   Right.
21      Q.   And adequate safety policies promote safety,
22  right?
23      A.   Repeat that one more time.
24      Q.   Adequate safety policies promote safety,
25  right?
```

68

```
1       A.   Right.
2       Q.   And appropriate monitoring of adherence to
3   safety policies promotes safety, right?
4       A.   Right.
5       Q.   Go to the second page, please.  This is,
6   again, talking about "Situational Awareness," all
7   right?  And I've highlighted one section at the bottom
8   that says, "Tell your supervisor if you see anything
9   that you feel is unsafe to you or others," right?
10      A.   Right.
11      Q.   So, one of the things that United Rentals
12  expected its employees to do is to tell their
13  supervisor if they see anything that's unsafe to
14  themselves or to others, right?
15      A.   Right.
16      Q.   And what is a supervisor supposed to do with
17  that information?
18      A.   Once the employee reports the hazard, it's the
19  manager's job to ensure that hazard is first
20  eliminated, try to eliminate or mitigate the hazard to
21  some extent to ensure that the hazard is controlled.
22      Q.   And also to warn the employees about the
23  hazard, right?
24      A.   Correct.
25      Q.   Who at the company is making sure that the
```

69

```
1   manager to whom the hazard is reported is actually
2   following up and either eliminating or mitigating the
3   risk from the hazard?
4       A.   At a branch level, it would be the D.M.'s
5   responsibility to ensure that, anything that came up,
6   the manager followed through.
7       Q.   And then it would ultimately become your
8   responsibility, right?
9       A.   Correct.
10           MR. HAYNES:  No.  Wrong one.  Sorry.  I
11  burned one of your --
12           THE REPORTER:  That's all right.
13           (Karabanoff Exhibit No. 4 was marked)
14      Q.   (BY MR. HAYNES)  I hand you Exhibit 4.  Do you
15  recognize that?
16      A.   Yes.
17      Q.   What is that?
18      A.   This is one of our policies and procedures.
19      Q.   And is this a part of a group of larger
20  policies and procedures?
21      A.   Yes.
22      Q.   What would you call the group of policies and
23  procedures?
24      A.   They are known as P.P.B.s.
25      Q.   Okay.  And this one is dated April 16 of 2018,
```

70

```
1   correct?
2       A.   Correct.
3       Q.   Do you know if this also applied back in 2017
4   when the incident happened?
5       A.   The date reflects the time that the document
6   was modified, not the time that the document was
7   created.
8       Q.   Okay.  So, some version of this applied back
9   in 2017?
10      A.   Correct.
11      Q.   Do you have any awareness of what the changes
12  were between the document that existed in 2017 as of
13  this incident versus the one that's sitting right here
14  before you as Exhibit 4?
15      A.   Not at this time, no.
16      Q.   Okay.  And this subject, this particular group
17  of policies is called "Personal Safety
18  Responsibility," right?
19      A.   Correct.
20      Q.   And if you look at the first page, there's a
21  section called "Purpose."  Do you see that?
22      A.   Yes.
23      Q.   The first bullet point says the purpose is "To
24  ensure that all Occupational Safety and Health and
25  vehicle safety programs at the company are implemented
```

71

```
1   and enforced so as to provide a working environment
2   that is safe and free of hazards for all United
3   Rentals employees," true?
4       A.   True.
5       Q.   So, in order to create a workplace that is
6   safe and free of hazards for all United Rentals
7   employees, you have to complement and enforce safety
8   policies, right?
9                MR. WRIGHT:  Objection, form.
10      A.   Correct.
11      Q.   (BY MR. HAYNES)  The second bullet point says
12  the purpose is that "Safe work practices are
13  established to help both employees and management
14  operate safely.  The Personal Safety Responsibility
15  Guidelines give direction on safe behavior
16  requirements and the educational development
17  requirements for infractions."  Did I read that right?
18      A.   Yes.
19      Q.   So, the safe work practices confined in this
20  document and in all United Rentals safety policies
21  apply to both employees and management, right?
22      A.   Correct.
23      Q.   And the purpose of them is to help both
24  employees and management operate safely, right?
25      A.   Correct.
```

72

```
1       Q.   If you look at the second page, it says, "This
2   policy applies to all employees of United Rentals,"
3   true?
4       A.   True.
5       Q.   Other than the P.P.B. and the -- the toolbox
6   monthly topics that we looked at in Exhibit 3, are
7   there any other group of policies that United Rentals
8   has that apply to safety of its employees at its
9   facilities?
10      A.   Yes, the H.S.E.S. manual.
11      Q.   So, that's a distinct document from what we're
12  looking at here in Exhibit 4?
13      A.   It's a different group of documents.
14      Q.   Okay.  That applies to the health and safety
15  of employees?
16      A.   Correct.
17      Q.   And they're expected to know and follow those?
18      A.   Correct.
19      Q.   And that would have applied to Mr. Ovalle on
20  the day of this incident?
21      A.   Correct.
22      Q.   He would have had to know and follow the
23  H.S.E. policies in the document you're mentioning?
24      A.   Correct.
25      Q.   If you go to the second page, please.  There
```

73

```
1   is a section -- it's Section 4 called -- titled
2   "Policy."  Do you see that?
3       A.   Yes.
4       Q.   It's talking about how "United Rentals is
5   committed to a culture that fosters safe work
6   behaviors and safe working conditions," right?
7       A.   Right.
8       Q.   And it says, "To create and maintain this
9   safety culture, we have implemented a comprehensive
10  injury and illness program, numerous safety-related
11  policies and procedures, and comprehensive employee
12  safety training," right?
13      A.   Right.
14      Q.   Does the comprehensive injury and illness
15  program have a title, or what is that about?
16      A.   A comprehensive injury and illness program is
17  the H.S.E.S. manual.
18      Q.   Okay.  Who is responsible for doing the
19  employee safety training at the company?
20      A.   The safety training is established by
21  corporate, and we funnel to the managers.  Their
22  direct -- their direct reports are responsible for
23  ensuring that training's completed.
24      Q.   All right.  Do you agree that the importance
25  of safety cannot be overstated at United Rentals?
```

74

1    A.    Say that one more time.
2    Q.    Sure.  Do you agree that the importance of
3    safety cannot be overstated at United Rentals?
4    A.    Yes.
5    Q.    Do you agree that all employees, including
6    management, are expected to keep a watchful eye for
7    dangerous conditions and correct safety hazards?
8    A.    Yes.
9    Q.    Would you go to the next page, please?  This
10   is Section 5 called "Responsibilities."  Do you see
11   that?
12   A.    Yes.
13   Q.    Actually, let me back up.  Anything that we've
14   talked about so far with respect to Exhibit 4, was any
15   of that different back in 2017 at the time of this
16   incident?
17   A.    I am not aware.  I'm not sure.
18   Q.    Okay.  Would it -- does it seem like it would
19   have been different?
20   A.    Based on the date -- the date reflects the
21   time that the document was revised, not the time that
22   the document was created.
23   Q.    Yeah.  I understand; but regarding the purpose
24   and applicability, that wouldn't have changed in --
25   after 2017, would it?

75

1    A.    No.
2    Q.    All right.  Okay.  When it comes to
3    responsibilities --
4          MR. WRIGHT:  I'm sorry.  What page are
5    you on?  The second one?
6          MR. HAYNES:  Yeah.  It's -- it's URI
7    332.
8          MR. WRIGHT:  All right.
9          MR. HAYNES:  Page 3 of the document.
10   Q.    (BY MR. HAYNES)  This is -- the first section
11   talks about the responsibility as of location
12   management, right?
13   A.    Right.
14   Q.    In other words, the branch managers, right?
15   A.    Correct.
16   Q.    And in the case of Mr. Ovalle, it would have
17   been two people responsible for that, true?
18   A.    True.
19   Q.    All right.  It says, "Management will take
20   necessary internal and external measures to ensure the
21   personal safety of employees," right?
22   A.    Right.
23   Q.    It says, "Management will enforce all
24   applicable regulations, policies and procedures, and
25   ensure that all employees follow established safe work

76

1    practices," right?
2    A.    Correct.
3    Q.    If those don't happen, people can get hurt,
4    can't they?
5    A.    There's a possibility.
6    Q.    That's why we have the safety policies to
7    begin with, right?
8    A.    Correct.
9    Q.    All right.  It goes on to say that "Management
10   will immediately halt any unsafe work practice and
11   document any safety infractions," right?
12   A.    Correct.
13   Q.    So, if management becomes aware of any unsafe
14   work practice, it is supposed to immediately halt that
15   unsafe work practice, right?
16   A.    Correct.  Until a elimination or mitigation
17   plan is put in place.
18   Q.    So, when management becomes aware of an unsafe
19   work practice at a United Rentals facility, it's
20   supposed to immediately halt work, correct?
21   A.    Correct.
22   Q.    And then it's supposed to try to fix the
23   safety issue, right?
24   A.    Correct.
25   Q.    And if it can't fix it, it needs to mitigate

77

1    against it and warn about it appropriately, right?
2    A.    Correct.
3    Q.    Okay.  There's not supposed to be a delay
4    between the time that management becomes aware of the
5    unsafe work practice and the time management halts the
6    unsafe work practice, right?
7    A.    Right.  Something -- something is in place to
8    mitigate that hazard or eliminate it.
9    Q.    Right.  It's supposed to be -- strike.  New
10   question.
11         Management is supposed to immediately
12   halt work when they become aware of the unsafe work
13   practice, right?
14   A.    Correct.
15   Q.    Okay.  It also says that "Management will
16   review all unsafe acts, incidents and safety
17   violations to determine and implement appropriate
18   disciplinary action," correct?
19   A.    Correct.
20   Q.    Is there some set of guidelines under which
21   management makes the disciplinary decision, or is it
22   kind of up to their discretion?
23   A.    It's a collaboration between the branch
24   manager and the H.R. director.
25   Q.    Do you have any input on that?

---

**78**

1    A.   If it's a safety infraction, they will loop me
2  in as well.
3    Q.   All right.  It also says that "Management will
4  ensure that all employees have been adequately trained
5  to perform their job safely," correct?
6    A.   Correct.
7    Q.   That's a part of United Rentals' obligation to
8  provide a safe workplace, right?
9    A.   Correct.
10    Q.   It also says that "Management will ensure that
11  employees are provided adequate tools to perform their
12  job safely," true?
13    A.   Correct.
14    Q.   That's a part of United Rentals' obligation to
15  provide its employees with a safe workplace, right?
16    A.   Right.
17    Q.   Go to the next page, page 4 of 8.  It also
18  discusses the responsibilities of the division or
19  regional safety managers, right?
20    A.   Correct.
21    Q.   And the first two subsections essentially talk
22  about how district and regional managers help the
23  branch managers do their job, right?
24    A.   Correct.
25    Q.   And then the third section of that discusses

---

**79**

1  how the regional managers will assist in designing and
2  implementing safety and training programs, right?
3    A.   Right.
4    Q.   How do they do that?
5    A.   So, basically it's a plan on how we're going
6  to execute any new training initiatives that are
7  coming down and ensuring that it gets completed in a
8  timely fashion.
9    Q.   All right.  And then this next section talks
10  about the guidelines and various offenses the company
11  can determine and then discipline that can be meted
12  out based on those offenses, right?
13    A.   Correct.
14    Q.   Mr. Ovalle was not found to have committed any
15  of these offenses, was he?
16    A.   Say that one more time.
17    Q.   Mr. Ovalle was not found to have committed any
18  of the offenses listed in this document, was he?
19    A.   Can you tell me what section you're looking
20  at?
21    Q.   Sure.  The section -- it's generally Section 6
22  that begins on page 4, and it continues onto page 7.
23  It lists Level I offenses, Level II offenses; and I
24  think that's it.
25    A.   And the question one more time?

---

**80**

1    Q.   Did y'all find that Mr. Ovalle committed any
2  of these?
3    A.   No.
4    Q.   Okay.
5            (Karabanoff Exhibit No. 5 was marked)
6    Q.   (BY MR. HAYNES)  I hand you Exhibit 5.  Do you
7  recognize that?
8    A.   Yes.
9    Q.   What is that?
10    A.   It is a P.P.B. Employee Safety and Health.
11    Q.   So, this is another P.P.B. from United
12  Rentals, in other words, another safety policy from
13  United Rentals.  This one's titled "Employee Safety
14  and Health," right?
15    A.   Correct.
16    Q.   And let me back up for a second.  Anything
17  that we discussed in Exhibit 4, would any of that have
18  been different at the time of the incident with
19  Mr. Ovalle that we discussed?
20    A.   Again, the document reflects when it was
21  modified, not when it was created; and at this time,
22  I -- I would have to go back and look.  If there was
23  minor changes, I couldn't tell you.
24    Q.   Okay.  I mean, does United Rentals still have
25  a copy of the version that was in effect back in 2017?

---

**81**

1    A.   Not in the online system.
2    Q.   Does it have it anywhere?
3    A.   I couldn't tell you.
4    Q.   I mean, setting aside the differences that may
5  exist, do you agree that all those policies should
6  have applied back in 2017?
7    A.   Yes.
8    Q.   Okay.  Okay.  The purpose of Exhibit 5, the
9  Employee Safety and Health policies, is "To provide a
10  safe working environment for all United Rentals
11  employees," right?
12    A.   Right.
13    Q.   All right.  And then under Policy, it's
14  talking about the responsibilities of each United
15  Rentals branch manager, true?
16    A.   True.
17    Q.   The first policy that's listed -- the first
18  responsibility listed is to "Inspect the branch
19  regularly for safety or health hazards," right?
20    A.   Right.
21    Q.   How often is regularly?
22    A.   There is a monthly walk-around that the
23  managers are required to do on a monthly basis to
24  ensure that the branch is inspected.
25    Q.   Is there a sort of checklist that they have to

---

82

1  keep track of, things that they're supposed to be
2  looking for each month?
3      A.   Yes, there is.
4      Q.   And are you aware of whether Mr. Silva was
5  conducting these monthly walk-arounds in 2017?
6      A.   At the time, he was.
7      Q.   Okay.  And why is it monthly?  In other words,
8  which document, which policy, which -- which
9  management employee is setting the period as monthly?
10     A.   That was what's in the procedure.  That's the
11 way the procedure was written --
12     Q.   Okay.
13     A.   -- on a monthly basis.
14     Q.   So, there is a written procedure that governs
15 this?
16     A.   Yes.
17     Q.   Is that in the H.S.E. manual we talked about?
18     A.   Correct.
19     Q.   All right.  Second responsibility of the
20 branch manager is to "Maintain the branch in
21 compliance with all governmental regulations,"
22 correct?
23     A.   Correct.
24     Q.   That would include building codes, things like
25 that?

83

1      A.   We don't expect our branch managers to know
2  the building codes.  That's handled by our facilities
3  group prior to us moving in.
4      Q.   Okay.  Who is responsible for making sure
5  they're up to code as time progresses?
6      A.   It varies from state to state, but we have to
7  have a -- obtain an operating permit to do business,
8  which at that point either the city or the county
9  review to make sure that everything's up to code.
10     Q.   But who at United Rentals would be responsible
11 for making sure that permitting is up to date and
12 current?
13     A.   It would be facilities.
14     Q.   Okay.  Do -- does anyone boots-on-the-ground
15 at the branch have any responsibility for making sure
16 the facility is up to code?
17     A.   Can you explain exactly what you mean when you
18 say "up to code"?
19     Q.   Yeah.  You just -- you just talked about how
20 buildings have to be permitted, true?
21     A.   True.
22     Q.   You're aware that United -- I mean, United
23 Rentals' entire business is renting heavy equipment
24 out of brick-and-mortar facilities, right?
25     A.   Correct.

84

1      Q.   And it doesn't always own these
2  brick-and-mortar facilities, right?
3      A.   Correct.
4      Q.   But it leases them and has responsibility for
5  maintaining them, true?
6      A.   Correct.
7      Q.   And United Rentals is aware as a company that,
8  in each discreet geographic region, there might be
9  building codes, city ordinances that they have to
10 follow, right?
11     A.   Correct.
12     Q.   So, who is responsible at a
13 boots-on-the-ground level for making sure those codes
14 are all followed?
15     A.   That would be the branch manager --
16     Q.   All right.
17     A.   -- in collaboration with facilities.
18     Q.   All right.  No. 3 says that the branch manager
19 is supposed to "Maintain all required safety logs and
20 records and post the required notices," right?
21     A.   Correct.
22     Q.   What does it mean by "safety logs and
23 records"?
24     A.   Morning huddle signings, any training that was
25 done, make sure -- forklift training, manlift

85

1  training, make sure that that's in the employee's
2  file.
3      Q.   All right.  So, there should be a record of
4  every single morning safety meeting that ever took
5  place at the Canyon facility, right?  There should be?
6      A.   There should be.
7      Q.   Okay.  And then it says, "Update United
8  Rentals Safety System as appropriate."  U.R.S.S.?
9      A.   Correct.
10     Q.   What is that?
11     A.   U.R.S.S. is the platform we use to report good
12 catches, near misses, any incident that may occur.
13     Q.   This is company software?
14     A.   Correct.
15     Q.   All right.  It says that the managers are
16 supposed to "Cultivate a culture where safe work
17 practices and behaviors are followed daily," right?
18     A.   Correct.
19     Q.   It says that includes "regularly walking
20 through the shop and yard to observe employees and
21 work conditions and practices," correct?
22     A.   Correct.
23     Q.   That's an expectation United Rentals has for
24 its managers, right?
25     A.   Correct.

86

1    Q.   And that's something that you, among others,
2    has a responsibility to make sure the manager is
3    doing, right?
4    A.   Correct.
5    Q.   Are they supposed to be documenting these --
6    these daily walk-throughs?
7    A.   No.
8    Q.   They only document the monthly walk-throughs?
9    A.   Correct.
10   Q.   It also says that the manager is supposed to
11   "Fully implement and maintain the United Rentals
12   I.I.P.P.," meaning, "Injury and Illness Prevention
13   Program," true?
14   A.   Correct.
15   Q.   What is the I.I.P.P.?
16   A.   It's -- the Injury and Illness Prevention
17   Program is keeping up with all the training the
18   employee does, making sure that the file is created
19   and everything is in the employee's file.
20   Q.   Okay.  Other than training, is there any other
21   aspect of the Injury and Illness Prevention Program?
22   A.   There could be the emergency contacts, any
23   evaluations, so forth, so on.
24   Q.   Okay.  No. 6 requires the branch manager to
25   fully comply with three aspects.  One is "Employee

87

1    injuries must be reported through the U.R.I. incident
2    intervention line, reported to the division or region
3    safety representative and documented in U.R.S.S.,"
4    correct?
5    A.   Correct.
6    Q.   What is the U.R.I. incident intervention line?
7    A.   That is the work care line where employees
8    call and report an incident and they get assessed by a
9    nurse and then they receive further instruction from
10   the nurse on the other line.  It's a third-party
11   service that United Rentals has.
12   Q.   Do the managers ever participate in that
13   process?
14   A.   Depending on the circumstances, sometimes.
15   Q.   How would they participate?
16   A.   If for some reason the employee cannot report
17   for whatever reason, they're in the hospital or they
18   can't talk for whatever reason, then the manager would
19   report the incident on behalf of the employee; and
20   then a follow-up call between the employee and the
21   nurse would take place at a later time.
22   Q.   United Rentals should never prevent an
23   employee from being able to report an injury, right?
24   A.   Correct.
25   Q.   That would be unsafe, wouldn't it be?

88

1    A.   Correct.
2    Q.   There would be no circumstances under which it
3    would be appropriate for United Rentals to tell one of
4    its employees to not report an injury they had
5    sustained, right?
6    A.   Correct.
7    Q.   It also says that the branch managers have to
8    report near-miss incidents and document them in the
9    U.R.S.S. system, true?
10   A.   True.
11   Q.   And they're reviewed for corrective actions,
12   right?
13   A.   Correct.
14   Q.   What is a near-miss incident?
15   A.   Near-miss incident is -- there's different
16   buckets in that system under the near-miss tab.  Near
17   miss is an accident that almost -- that occurred that
18   almost could have gotten somebody hurt but did not, to
19   fonder (sic) a good catch or a stop-work authority.
20   Q.   And so, sometimes unsafe actions occur but
21   thankfully don't result in an injury, right?
22   A.   Correct.
23   Q.   And those unsafe acts are still being tracked
24   by United Rentals, correct?
25   A.   Correct.

89

1    Q.   So they can identify the unsafe behavior and
2    try to stop it from happening, right?
3    A.   Correct.
4    Q.   And that would be the corrective action,
5    correct?
6    A.   Correct.
7    Q.   It says, "All incidents must be investigated
8    and reported," correct?
9    A.   Correct.
10   Q.   It says, "The H.S.E.S. department will follow
11   up on each of these as appropriate," true?
12   A.   True.
13   Q.   Are you in the H.S.E.S. department?
14   A.   Yes.
15   Q.   It says, "The Causal Factors Tab must be
16   completed in U.R.S.S.," right?
17   A.   Correct.
18   Q.   And that's the thing you mentioned earlier
19   when you generated the investigation report for
20   Mr. Ovalle's incident about a week after it happened,
21   right?
22   A.   Correct.
23   Q.   Go to the second page, please.  There's a
24   section called "Procedure," and it's discussing
25   "Regular Safety Practices."  Do you see that?

90

1    A.    Yes.
2    Q.    It says the branch manager has to "Appoint a
3    safety champion"?
4    A.    Correct.
5    Q.    What is a safety champion?
6    A.    Safety champion is a employee that has a dual
7    role and assists the branch manager in some of the --
8    the branch manager delegates some of the safety
9    responsibilities to the safety champion.
10    Q.    Is the safety champion an employee at the
11    facility?
12    A.    Correct.
13    Q.    Who was the safety champion on the day of this
14    incident?
15    A.    I do not recall.  In some circumstances we
16    have a safety champion that oversees a location, not
17    necessarily a division.  So, in other words, it would
18    be somebody from the pump side.
19    Q.    Would there be a record of who the safety
20    champion was as of the date of this incident?
21    A.    I would have to check.  I'm not sure.
22    Q.    Should there be a record?
23    A.    There should be a record.
24    Q.    It says the safety champion is supposed to
25    "Inspect the facility for safety or health hazards per

91

1    the I.I.P.P.," correct?
2    A.    Correct.
3    Q.    So, the safety champion is one of the ones
4    who's supposed to be conducting these regular
5    walk-arounds to find unsafe actions, conditions,
6    things like that, at the facility, true?
7    A.    Correct.
8    Q.    And the I.I.P.P. is the program that says that
9    it's supposed to happen once a month, right?
10    A.    Correct.  To document it once a month,
11    correct.
12    Q.    And then it says the branch manager is
13    supposed to "Review the inspection form immediately
14    following inspection and note specific corrective
15    actions taken or planned and document in U.R.S.S. as
16    appropriate," true?
17    A.    Correct.
18    Q.    All right.  Go to the second page.  It's
19    talk -- or not the second page.  The next page I
20    should say.  It's talking about the branch manager's
21    responsibility to post summaries of occupational
22    illnesses or injuries, right?
23    A.    Correct.
24    Q.    What are those summaries?
25    A.    They're a -- a report that's generated by

92

1    corporate that's sent out to all the branch managers
2    for every injury that occurs across United Rentals.
3    Q.    All right.  What's the purpose of that?
4    A.    The purpose of that is to raise the awareness
5    and educate employees of an incident that occurred to
6    ensure that they're aware it doesn't happen again.
7    Q.    How do they disseminate these summaries to the
8    branch managers?
9    A.    Once the -- the incident's reported, the
10    form's finalized, it's sent via e-mail to all the
11    branch managers.
12    Q.    It says the branch manager is also supposed to
13    "Establish a Safety Committee" and "Co-chair the
14    Safety Committee," right?
15    A.    Correct.
16    Q.    What is a safety committee?
17    A.    Safety committee is a group of employees at a
18    location that gather up once a month to discuss any
19    issues that may have come about, any discussions about
20    P.P.E., new uniforms or new tools that they may need,
21    depending on seasonality, different cooling devices or
22    warming devices, depending on the situation.
23    Q.    And that program applied as of the date of
24    this incident, right?
25    A.    Correct.

93

1    Q.    That's been going on for a while, hasn't it?
2    A.    Correct.
3    Q.    So, you would expect there to have been a
4    safety committee within the Canyon, Texas, branch,
5    right?
6    A.    Correct.
7    Q.    And there would be documents reflecting their
8    activities, right?
9    A.    Correct.
10    Q.    Do you know who was on the safety committee at
11    the Canyon, Texas, branch?
12    A.    I do not recall.
13    Q.    Do you know if they actually had a safety
14    committee?
15    A.    The -- the pumps branch that was there was
16    active in a committee, and they oversaw that location.
17    Correct.
18    Q.    What about the HVAC/power branch?
19    A.    They -- the committee assisted us.  Since we
20    were a small branch, they assisted us with the
21    committee.  Any questions, concerns, they would come
22    to our employees and communicate the findings of the
23    committee to us.
24    Q.    Were you on the safety committee for the
25    Canyon, Texas, branch?

Michael Karabanoff - August 12, 2019

---

94

1    A.    No, I was not.
2    Q.    When you say "us," what do you mean by that?
3    A.    The power/HVAC side.
4    Q.    Okay.  Okay.  So, let me just ask.  Based on
5    your personal knowledge and recollection and
6    experience, do you know for a fact that there was a
7    safety committee at the Canyon, Texas, branch in March
8    of 2017?
9    A.    Yes.
10   Q.    How do you know that?
11   A.    There's a group of auditors that go around,
12   and that is one of the questions that is asked.  And
13   we get notified of the results if any of the safety
14   elements are missing.
15   Q.    Okay.  And you have no recollection of getting
16   a report from an auditor that said there was no safety
17   committee?
18   A.    Correct.
19   Q.    Who are the auditors?
20   A.    It varies.  There's probably a dozen different
21   auditors; and they go around and audit different
22   branches in every aspect of the business, not just
23   safety.
24   Q.    Are we talking United Rentals employees?
25   A.    Correct.

---

95

1    Q.    Do you know if the Canyon, Texas, branch had
2    been audited as of 2017?
3    A.    Yes.
4    Q.    How frequently do they audit the branches?
5    A.    Once a year.
6    Q.    And they're auditing them for safety, among
7    other things?
8    A.    Correct.
9    Q.    Okay.  Are they auditing whether or not the
10   branches are following the policies that we looked at
11   here today?
12   A.    There's a very detailed, specific checklist
13   that the auditors go through with the branch managers.
14   Q.    Do you know if -- on personal knowledge, do
15   you know if the Canyon, Texas, branch was audited in
16   2016?
17   A.    Yes.
18   Q.    Do you know on personal knowledge whether the
19   Canyon, Texas, branch was audited in 2017?
20   A.    No, I do not.
21   Q.    Why do you know about 2016 and not 2017?
22   A.    Because I was the director in 2016 for the
23   power/HVAC group.  2017, I was just part of tools
24   later on in the year.  So, I don't --
25   Q.    So, you would in some way have been personally

---

96

1    involved in the audit in 2016?
2    A.    Correct.  I would have been notified.
3    Q.    Okay.  Can you just give me an overview of
4    where these auditors were, what divisions they're in?
5    A.    There's a -- they're assigned different
6    geographical areas.  So, regards of your line of
7    business, an auditor is assigned to a certain area;
8    and that's who -- they make their rounds in that
9    geographical area regardless of the line of business.
10   Q.    And are they -- is their job title "auditor"?
11   Or do they do other things, and then they do this
12   auditing once a year?
13   A.    No.  That's -- that's all -- that's their job.
14   Q.    Okay.  Do you know what division they're
15   considered to be working in or group or --
16   A.    Internal audit.
17   Q.    It says the branch manager is also supposed to
18   "Respond to any items noted by the Safety Committee
19   within 21 days," correct?
20   A.    Correct.
21   Q.    So, at minimum, the branch manager is supposed
22   to take action of some kind regarding any unsafe
23   issues that the safety committee has identified,
24   within 21 days, right?
25   A.    Correct.

---

97

1    Q.    All right.  If you go to the next page,
2    please.  It says the safety champion -- well, strike.
3    New question.
4          It says the safety committee has to meet
5    monthly "and discuss branch safety and incident
6    prevention," correct?
7    A.    Sorry.  What page were you in?
8    Q.    It's on page 4 of 5 at the top where it says
9    "Safety Committee."  I think it's the next page.
10   Here.
11   A.    Okay.  I see it.  7?
12   Q.    Yes, sir.  It says the safety committee is
13   supposed to meet every month "and discuss branch
14   safety and incident prevention," correct?
15   A.    Correct.
16   Q.    And then it says the safety committee is
17   supposed to discuss recommendations regarding any
18   current programs to be presented to the safety
19   department and also discuss monthly inspection
20   findings, true?
21   A.    True.
22   Q.    And this program was in place as of the date
23   of this incident, right?
24   A.    Correct.
25   Q.    And it had been for quite some time, right?

---

Michael Karabanoff - August 12, 2019

26 (Pages 98 to 101)

98

1    A.    Correct.
2    Q.    So, there should be a record every month of
3 the safety committee holding monthly meetings and
4 conducting monthly facility inspections, right?
5    A.    Correct.
6    Q.    All right.  How many times have you been to
7 the Canyon, Texas, facility that we're here discussing
8 today?
9    A.    I have not been to the Canyon location.
10    Q.    Okay.  Will you grab Exhibit No. 1 again,
11 please?  It's actually to your right.  It's the very
12 first exhibit.  There you go.  You're on the right
13 page.  If you go to Topic No. 4.  It's called -- or
14 Topic No. 4 is "The layout and characteristics of the
15 United Rentals facility where the incident occurred,"
16 correct?
17    A.    Correct.
18    Q.    And you're here testifying about that topic,
19 right?
20    A.    Correct.
21    Q.    But you have never been to the United Rentals
22 facility where the incident occurred, right?
23    A.    Correct.
24    Q.    Do you think that there might be somebody else
25 that knows more about it than you do?

99

1    A.    The manager that runs the location.
2    Q.    Essentially anyone that's actually physically
3 been there, right?
4    A.    Correct.
5    Q.    And other than the photographs that Mr. Ovalle
6 provided in this lawsuit that you looked at to get
7 ready for your deposition, have you ever seen any
8 photographs of the facility?
9    A.    No.
10    Q.    You've never seen any photographs that United
11 Rentals provided you?
12    A.    Not that I recall.
13    Q.    And I think you testified earlier that United
14 Rentals took no photographs as part of its
15 investigation of this incident, right?
16    A.    Correct.
17    Q.    All right.  Can you specifically name
18 individuals that would know more about the layout and
19 characteristics of the United Rentals facility where
20 the incident occurred?
21    A.    Art Silva would be --
22    Q.    But he no longer works there, right?
23    A.    I'm not sure.  I'm not part of that region
24 anymore.  I couldn't tell you.
25    Q.    Okay.  It's my understanding that United

100

1 Rentals no longer occupies the facility in Canyon,
2 Texas, that it did at the time of this incident.  Did
3 you know that?
4    A.    Correct.  Yes, I did.
5    Q.    When did you become aware of that?
6    A.    I guess when I got contacted about deposition.
7 I was not aware that it was closed.
8    Q.    Okay.  Do you know if they're still operating
9 a facility in Canyon anywhere else?
10    A.    I am not sure.  Not for that power/HVAC group.
11    Q.    And I -- I may have asked you this earlier and
12 I'm sorry but have you -- do you know if they have
13 a -- another location in the Texas Panhandle?
14    A.    I'm not sure.
15    Q.    Amarillo?
16    A.    I'm not sure.
17    Q.    Okay.  So, you don't have any personal
18 knowledge or knowledge that you've gained through this
19 lawsuit about how the facility in Canyon was set up,
20 do you?
21    A.    No.  I relied on the district manager and the
22 operations manager to explain the layout and walk me
23 through the layout of the shop on the power/HVAC side.
24    Q.    You relied on them to explain it to you when?
25    A.    When they were setting up the shop.

101

1    Q.    So, this is before Mr. Ovalle was hurt?
2    A.    Correct.
3    Q.    How much longer before?
4    A.    I don't recall when they moved -- first moved
5 in.
6    Q.    Was it more than a year?
7    A.    I don't think so, no.
8    Q.    Okay.  So, your knowledge of the layout of the
9 facility is limited to discussions you had with people
10 who worked there as of when they were originally
11 setting it up, right?
12    A.    Correct.
13    Q.    So, this would have been in 2016?
14    A.    Correct.
15    Q.    Okay.  Did you also participate, or do you
16 have any knowledge of Topic No. 11?
17    A.    Yes.
18    Q.    Okay.  Did you assist in identifying documents
19 responsive to our discovery requests?
20    A.    Yes.
21    Q.    Okay.  Have you produced any of the monthly
22 inspection reports from the Canyon, Texas, facility?
23    A.    Yes.
24    Q.    You have?
25    A.    Yes.

Michael Karabanoff - August 12, 2019

27 (Pages 102 to 105)

---

102

1    Q.    You've provided those to your lawyers?
2    A.    The -- are you referring to these exhibits?
3    Q.    No.  I'm talking about the monthly inspection
4    reports --
5    A.    Oh.
6    Q.    -- that the branch managers fill out.
7    A.    No.
8    Q.    Why haven't you produced those?
9    A.    The branch is no longer operating.  I -- I
10   wouldn't know where to start.
11   Q.    It wouldn't be in the company-wide database
12   system we've been discussing today?
13   A.    No.
14   Q.    Those kinds of records aren't kept in the
15   company-wide database?
16   A.    No.
17   Q.    Where are they kept?
18   A.    It's a manual form.  It's a paper form.
19   Q.    Why is that not kept in the database?
20   A.    The system does not have the capability to
21   perform the audit electronically.
22   Q.    When you say "audit," do you mean these annual
23   audits?
24   A.    Monthly inspection -- no.  The monthly
25   inspections.  Sorry.

---

103

1    Q.    Okay.  What about the monthly inspections by
2    the safety committees, are there any records of those?
3    A.    They -- they would be at the branch location.
4    Q.    And you have no idea when the branch location
5    stopped operating?
6    A.    Correct.
7    Q.    You have no idea what happened to all the
8    paperwork that existed there?
9    A.    Correct.
10   Q.    For all you know, it could have been shredded?
11   A.    Correct.
12   Q.    It could have been burned up?
13   A.    Correct.
14   Q.    It could have been intentionally destroyed?
15   A.    Say that one more time.
16   Q.    It could have been intentionally destroyed,
17   for all you know?
18   A.    I -- I couldn't tell you what -- what happened
19   to it.
20   Q.    Does United Rentals have a document-retention
21   policy?
22   A.    For an operating branch, yes.
23   Q.    What's the policy?
24   A.    We keep our monthly meetings for a calendar
25   year, and then we -- we start over.  We keep our -- a

---

104

1    log of the training for a calendar year, and then we
2    start over.
3    Q.    Does that also apply to digital records?
4    A.    No.
5    Q.    Well, aren't the training records all kept
6    digitally?
7    A.    To some extent, yes.  Our monthly training,
8    yes.
9    Q.    Well, what other training is there?
10   A.    There is forklift training, different types of
11   equipment training.  There's manufacturer's training
12   for different particular tasks, for different
13   equipment, depending on your job title.
14   Q.    Uh-huh.
15   A.    There's training for drivers.  There's late
16   start.  There's a lot of training that takes place
17   that gets tracked differently.
18   Q.    Okay.  So, if I consult the United Rentals
19   database that we've talked about today that's also
20   referenced in the exhibit we just looked at, it's not
21   going to contain any monthly inspection reports
22   conducted by either the branch manager or the safety
23   committee, correct?
24   A.    Correct.
25   Q.    And your testimony is that that is -- that is

---

105

1    a policy of United Rentals to not keep that data in
2    the database?
3    A.    Correct.  In --
4    Q.    It's kept in hard-copy format?
5    A.    Correct.
6    Q.    And the document-retention policy is to
7    maintain those hard-copy documents for one year,
8    right?
9    A.    Correct.
10   Q.    And then they're destroyed?
11   A.    They're not.  They're sent to Iron Mountain.
12   We package them up.  Now, whether Iron Mountain holds
13   them or not, I'm not sure; but they are -- they are
14   transferred to Iron Mountain, which is a third-party
15   service.
16   Q.    Well, I mean, it's a third-party service that
17   United Rentals hires, right?
18   A.    Correct.
19   Q.    United Rentals gets to decide whether Iron
20   Mountain destroys its documents, doesn't it?
21   A.    Correct.
22   Q.    Do you know whether United Rentals tells Iron
23   Mountain to destroy its documents?
24   A.    I'm not aware.
25   Q.    Okay.  Do you know -- if you look at Topic

---

106

1   6-i, that's United Rentals' policies and procedures
2   regarding document retention.
3       A.   Correct.
4       Q.   Do you know who would know more about those
5   policies?
6       A.   No.  We are -- we're familiar with document
7   retention at a branch level, what happens at the
8   branch and how long we keep it; and then the manager
9   proceeds and starts over every year.
10      Q.   Right.  But at some point the documents get
11  shipped to Iron Mountain; and Iron Mountain does
12  something with them, right?
13      A.   Correct.
14      Q.   They either keep them or destroy them, right?
15      A.   Correct.
16      Q.   And you don't know the policy of United
17  Rentals as to whether or not Iron Mountain is keeping
18  them or destroying them, right?
19      A.   Correct.
20      Q.   Can you name any individuals at the company
21  who would know more about that policy?
22      A.   I would -- I couldn't tell you, no.
23      Q.   Okay.  Does Iron Mountain -- strike.  New
24  question.
25           Does United Rentals have any

107

1   document-retention policies that pertain to incidents
2   that are in litigation?
3       A.   Say that one more time.
4       Q.   Sure.  Does United Rentals have any
5   document-retentions policies that apply to incidents
6   that are in litigation, in lawsuits?
7       A.   No.
8       Q.   So, there's no difference between the
9   policies, as far as you know?
10      A.   Correct.
11      Q.   So, there -- does United Rentals issue
12  internal litigation holds for documents?
13      A.   No.
14      Q.   So, you're not aware of any company policy
15  where United Rentals will issue a litigation hold to
16  its employees to not destroy documents that might be
17  part of an ongoing lawsuit or a potential lawsuit?
18      A.   No.  If we are notified to do something, we're
19  notified; but I'm not aware of a particular policy
20  that instructs us to --
21      Q.   That would --
22      A.   -- to do so.
23      Q.   That would be news to you, right?
24      A.   Correct.
25      Q.   So, as far as you know, all of the documents

108

1   pertaining to facility inspections with respect to the
2   Canyon, Texas, facility are destroyed?
3           MR. WRIGHT:  Objection, form.
4       A.   I couldn't tell you.
5       Q.   (BY MR. HAYNES)  Well, you know this for a
6   fact.  You've never seen them, right?
7       A.   Correct.
8       Q.   And if the retention policy was being
9   followed, they would have been shipped to Iron
10  Mountain within a year, right?
11      A.   Correct.
12      Q.   And then you don't know what Iron Mountain
13  would have done with them?
14      A.   Correct.
15      Q.   Because you don't know what United Rentals
16  would have told Iron Mountain to do with them?
17      A.   Correct.
18      Q.   And there is no other digitally-stored
19  information that would encompass the information kept
20  in those physical records, right?
21      A.   Right.
22      Q.   All right.  So, the only real digital
23  information that you would still have with respect to
24  the Canyon, Texas, facility would be e-mails, right?
25      A.   Those e-mail -- our e-mail system is -- over a

109

1   certain time, it's -- you know, because of memory or
2   whatever, e-mails just go away unless you actually
3   save them.  So, digital recs would be in the U.R.S.S.
4   system, any near misses, good catches, any other
5   incidents that may have occurred at that branch.
6       Q.   So, if someone didn't report any near misses
7   or injuries at the Canyon, Texas, facility during the
8   time it was open till the time it closed, there would
9   be no record of it, right?
10      A.   Correct.
11      Q.   And now, regardless of whether those monthly
12  inspection reports revealed any hazards or not,
13  they're gone?
14      A.   I wouldn't know.  I don't know where they're
15  at.
16      Q.   Okay.  So, now we have to just rely on
17  people's memories, right?
18      A.   Correct.
19      Q.   About the condition and hazards at a property
20  between March of 2017 and approximately the year
21  before, right?
22      A.   Correct.
23      Q.   Because we're not aware of any records that
24  might exist that may show what the conditions were?
25      A.   I don't know what happened to them.

110

1    Q.    Okay.  Do you know as -- strike.  New
2  question.
3          Do you know what door that Al Ovalle was
4  required to use to access the Canyon, Texas, facility
5  back in March of 2017?
6    A.    There -- to my knowledge, there's no specific
7  door that's required for an employee to use.  It's --
8  the facility's their facility.  So, there's no
9  specific door for employees to go in and out, to and
10  from.
11    Q.    That's to your knowledge, right?
12    A.    Correct.
13    Q.    But you've never been there?
14    A.    Correct.
15    Q.    And you didn't set the policies on which door
16  you had to enter or not, right?
17    A.    Correct.
18    Q.    So, you can't really dispute what he says
19  about that, right?
20    A.    That it's not -- that is not a normal policy
21  within any United Rentals store, to have assigned
22  doors.
23    Q.    Okay.  But --
24          MR. HAYNES:  Objection, nonresponsive.
25    Q.    (BY MR. HAYNES)  You can't dispute

111

1  Mr. Ovalle's statements or testimony that he was
2  required to use a specific door to enter the facility,
3  can you?
4          MR. WRIGHT:  Objection, form.
5    A.    Correct.
6    Q.    (BY MR. HAYNES)  All right.  And you can't
7  dispute Mr. Ovalle's statements or testimony that he
8  was required to park in a certain location at the
9  Canyon, Texas, facility, can you?
10          MR. WRIGHT:  Objection, form.
11    A.    Correct.
12    Q.    (BY MR. HAYNES)  All right.  And did --
13  strike.  New question.
14          Do you remember the name of the
15  technician you interviewed as part of your
16  investigation?
17    A.    No, I do not.
18    Q.    Do you remember his or her job title?
19    A.    It's a technician.
20    Q.    But specifically?
21    A.    Mechanic.
22    Q.    In the pumps division?
23    A.    Pump division, yes.
24    Q.    Do you know which room within the facility
25  Mr. Ovalle was injured in?

112

1    A.    We have -- we have a power/HVAC side.  So, it
2  was on the bay -- one of our bays.
3    Q.    Okay.
4    A.    One of the power/HVAC bays where work is
5  performed.
6    Q.    Do you know what part of the building it was
7  in?
8    A.    He was inside the bay on our side in the shop.
9    Q.    Directionally do you know what part of the
10  building that's in?
11    A.    No.
12    Q.    You don't know if it's north, south, east or
13  west?
14    A.    No.
15    Q.    Do you know what rooms were adjacent to it, to
16  the east or west?
17    A.    There's an adjacent shop that connects through
18  a door.
19    Q.    Do you know what direction it is?
20    A.    No.
21    Q.    Do you know what facilities are -- strike.
22          Do you know what rooms were adjacent to
23  it to the north or south?
24    A.    No.
25    Q.    Do you know the dimensions of the room he was

113

1  injured in?
2    A.    No, I do not.
3    Q.    Do you know the dimensions of any of the rooms
4  in the facility?
5    A.    No, not to my knowledge.
6    Q.    You're aware that they don't have natural
7  light, right?
8    A.    Correct.
9    Q.    They have no windows, no -- no skylights,
10  anything like that?
11    A.    Correct.
12    Q.    So, if you walk in there and there's no lights
13  on, it's dark, true?
14    A.    True.
15    Q.    Do you know whether or not the door that
16  Mr. Ovalle was required to use to enter the building
17  had a light switch?
18          MR. WRIGHT:  Objection, form.
19    A.    To my knowledge, there was no door that he was
20  required to enter through.
21    Q.    (BY MR. HAYNES)  Well, let me ask it this way.
22  The door that Mr. Ovalle entered the morning he was
23  hurt, do you know if it had a light switch near it?
24          MR. WRIGHT:  Objection, form.
25    A.    I couldn't tell you.

114

1    Q.    (BY MR. HAYNES)  Did you ask him?
2    A.    That was never brought up to my attention.
3            MR. HAYNES:  I'll object to
4    nonresponsive.
5    Q.    (BY MR. HAYNES)  Did you ask him --
6    A.    No.
7    Q.    -- about whether -- please let me finish my
8    question.  His wife.  New question.
9            Did you ever ask Mr. Ovalle whether the
10   door that he entered the morning of this incident had
11   a light switch near it?
12   A.    No.
13           MR. WRIGHT:  Objection, form.
14   Q.    (BY MR. HAYNES)  Did you ask him about the
15   lighting conditions?
16   A.    No.
17   Q.    Did you notate on your incident -- strike.
18   New question.
19           Did you notate on your Incident
20   Investigation Report the people that you interviewed?
21   A.    No.
22   Q.    Why not?
23   A.    It was -- they were telling me what happened.
24   I verified with Mr. Ovalle what occurred.  I
25   documented in the U.R.S.S. system, and that was that.

115

1    Q.    There were no eyewitnesses to the incident
2    other than Mr. Ovalle, right?
3    A.    Correct.
4    Q.    Anything that anyone learned about this
5    incident was secondhand from Mr. Ovalle, right?
6    A.    Correct.
7    Q.    No one actually witnessed it, right?
8    A.    Correct.
9    Q.    Okay.  As far as you know, there were no
10   cameras or any other devices that would have captured
11   the events in question, right?
12   A.    Correct.
13   Q.    How do you know that?
14   A.    There was no -- no system.  I asked Art, and
15   there was no cameras in place.  So, I verified with
16   Art at the time of the incident.
17   Q.    Okay.  Do you know if there were any cameras
18   at any part of the facility?
19   A.    Not to my knowledge.
20   Q.    Okay.  Do you know who was present at the
21   facility when the incident took place?
22   A.    I know some of the people that were present.
23   Q.    Who were they?
24   A.    It was the branch manager for pumps.  I
25   believe there was one technician on the pumps side,

116

1    and that was the extent of my knowledge.  And Mr.
2    Ovalle.  There may have been other people there.  I'm
3    -- I'm not -- I wasn't aware.
4    Q.    Do you know anything about Mr. Ovalle's work
5    record at United Rentals?
6    A.    Explain.
7    Q.    I mean, I don't know how -- do you know
8    anything about his work record?
9    A.    Like evaluations, attendance?
10   Q.    Anything.
11   A.    Yes, I know some.
12   Q.    Tell me about it.
13   A.    He's a mechanic, lot of experience.  He's a
14   good employee; not had a bad evaluation, to my
15   knowledge, the previous year.  That's about the extent
16   that I --
17   Q.    Based on your knowledge, Mr. Ovalle was a good
18   employee, right?
19   A.    Correct.
20   Q.    There was nothing to indicate that he was
21   unsafe, right?
22   A.    No.
23   Q.    Nothing to indicate that he took risks when it
24   came to safety, right?
25   A.    Not to my knowledge.

117

1    Q.    Nothing to indicate that he was an untruthful
2    employee, right?
3    A.    Not to my knowledge.
4    Q.    Nothing to indicate that he was not in shape
5    enough to do the job, right?
6            MR. WRIGHT:  Objection, form.
7    A.    I -- I couldn't tell you if he was in shape or
8    not.
9    Q.    (BY MR. HAYNES)  I mean, do you have any
10   evidence you can offer the jury that Mr. Ovalle --
11   Mr. Ovalle's physical condition before this incident
12   happened was such that he couldn't do the work that
13   United Rentals asked him to do?
14   A.    No.
15   Q.    Has anybody ever told you that?
16   A.    No.
17   Q.    Do you have any reason -- any reason to
18   believe it?
19   A.    There's always C.N.A.s measured; and in the
20   performance document, Mr. Ovalle had a needs
21   improvement because the equipment percentage of not
22   available was high.
23   Q.    What does that have to do with his physical
24   condition?
25   A.    That's what I'm tell -- I couldn't tell you.

118

1  That's -- that's the only thing that I -- that I can
2  go by.
3      Q.   But that has --
4      A.   I don't know.
5      Q.   That has nothing to do with his physical
6  condition, to your knowledge?
7      A.   Correct.
8      Q.   Okay.
9          MR. HAYNES:  Do you want to take a
10  break?  Take a break.
11         THE VIDEOGRAPHER:  Off the record,
12  12:43.
13         (Brief recess)
14         THE VIDEOGRAPHER:  The time is 12:59,
15  back on the record, beginning of File 2.
16     Q.   (BY MR. HAYNES)  You ready to keep going?
17     A.   Yes.
18     Q.   What is your understanding of what happened to
19  Mr. Ovalle, based upon your investigation?
20     A.   Mr. Ovalle, what I understand, it was
21  afternoon on the 28th, around 2:00 o'clock.  He
22  noticed some water in one of the bays and proceeded to
23  clean and squeegee the water out of that bay; and in
24  doing so, while he was doing that activity, he slipped
25  and fell.

119

1      Q.   So, one of the -- new question.  Strike.  New
2  question.
3          He was using a squeegee that United
4  Rentals had provided him at the facility?
5      A.   Correct.
6      Q.   And that was intended to help employees keep
7  water off the floor?
8      A.   Correct.
9      Q.   And you -- it's your understanding that
10  Mr. Ovalle had to access the wet floor or get close to
11  it to be able to squeegee it, right?
12     A.   I wasn't there.  So, I'm not sure.
13     Q.   Well, based upon your investigation.
14     A.   He was cleaning the -- I'm not sure where the
15  squeegee was, but he was cleaning the -- or
16  squeegeeing the water at the time of his fall.
17     Q.   I mean, do you agree with me that to squeegee
18  or clean water off a floor, you have to get -- you
19  have to access the floor to clean it, right?
20     A.   You have to access the floor.  Correct.
21     Q.   All right.  Do you have any complaint about
22  his decision to try to use the squeegee to clean the
23  floor?
24     A.   No.
25     Q.   That's the way that United Rentals expected

120

1  him to clean the floor if it was wet, right?
2      A.   That was the mitigation for if there was a
3  spill, for them to clean up.
4      Q.   Okay.  And your belief is that it happened in
5  the afternoon?
6      A.   To my knowledge, in -- in part of my
7  investigation, it happened that afternoon on the -- on
8  the 28th.
9      Q.   All right.  And everything that you mentioned
10  about how it happened you gained from three interviews
11  that you conducted after the incident, right?
12     A.   Correct.
13     Q.   When did you conduct the interviews?
14     A.   When -- I started inquiring about the incident
15  when it was reported to me through Art Silva.
16     Q.   And when was that?
17     A.   I believe it was the next day, the next
18  morning.
19     Q.   All right.  Prior to conducting your interview
20  with Mr. Ovalle, did you have any other conversations
21  with him?
22     A.   Not to my knowledge.
23     Q.   Subsequent to your interview with Mr. Ovalle,
24  did you have any other conversations with him?
25     A.   Yes.

121

1      Q.   When?
2      A.   Couldn't recall.  I had several conversations
3  with him, just checking on him, and then followed up,
4  check on him when he was in the hospital.
5      Q.   Would these be phone calls?
6      A.   Correct.
7      Q.   Did you ever go visit him in the hospital?
8      A.   No.
9      Q.   So, to the best of your knowledge, the sum
10  total of your communications with Mr. Ovalle about
11  this incident are an interview you conducted and a
12  couple of phone calls to him after the interview to
13  check on him?
14     A.   Correct.
15     Q.   All right.  Do you agree that water on the
16  floor of the bay where Mr. Ovalle was hurt is a
17  hazard?
18     A.   It can potentially be a hazard.
19     Q.   Particularly because of the painted floor
20  which can make it very slippery, right?
21     A.   A painted surface could be more slippery than
22  an unpainted surface when wet.
23     Q.   That includes the floor of the bay where
24  Mr. Ovalle was injured, right?
25     A.   It was a painted surface, yes.

122

1    Q.    All right.  And what efforts did United
2    Rentals take, prior to the time that Mr. Ovalle was
3    hurt, to make that floor safe?
4            MR. WRIGHT:  Objection, form.
5    A.    Say that one more time, please.
6    Q.    (BY MR. HAYNES)  Sure.  What efforts did
7    United Rentals take, prior to the time that Mr. Ovalle
8    was hurt, to make that floor safe?
9            MR. WRIGHT:  Objection, form.
10   A.    I'm not aware.  They was -- they had the
11   proper tools.  There was spill kits on site.  There
12   was squeegees on site to clean up any potential spills
13   that occurred in their work areas.
14   Q.    (BY MR. HAYNES)  What's a spill kit?
15   A.    A spill kit is a container that has different
16   material to either clean up or contain a spill from
17   equipment or any type of liquid or fluid that may be
18   leaking on -- onto a floor.
19   Q.    How do you know that this facility had spill
20   kits?
21   A.    Because it's part of the set-up process.
22   Q.    But how do you personally know that this
23   facility had spill kits?
24   A.    I asked Art, and spill kits were in the bays.
25   Q.    You have no personal knowledge, right?

123

1            MR. WRIGHT:  Objection, form.
2    A.    I verified with the managers, and there were
3    spill kits there.
4    Q.    (BY MR. HAYNES)  Did you personally observe
5    spill kits?
6    A.    No.
7    Q.    You were told by Art Silva that there were
8    spill kits, right?
9    A.    Correct.
10   Q.    And you verified with who else?
11   A.    Just with Art.
12   Q.    Okay.  And what verification efforts did you
13   take to make sure he was correct?
14   A.    None.  Since the spill kits weren't used, the
15   method that was used to clean the spill at the bay was
16   the squeegee.
17   Q.    So, you don't have an issue with Mr. Ovalle
18   allegedly using a squeegee to make the floor dry
19   versus the spill kit, right?
20   A.    No, I don't.
21   Q.    And I mean, you worked in petrochemical plants
22   before, right?
23   A.    Correct.
24   Q.    You are aware that -- I mean, they use
25   diapers, right?  You know what a diaper is?

124

1    A.    Yes.
2    Q.    Diapers are used for hydrocarbons, right,
3    primarily?
4    A.    Correct.
5    Q.    Not water, right?
6    A.    Correct.
7    Q.    Okay.  Do you have any complaints about what
8    Mr. Ovalle did?
9    A.    No.
10   Q.    Do you fault him for slipping and falling?
11   A.    I don't fault him for slipping and falling.
12   It's every employee's personal responsibility to -- as
13   they're doing your task, to continue to do a Hazard
14   360 and recognize, you know, any potential hazards,
15   take extra -- extra precaution so they don't get hurt
16   while performing their task.
17   Q.    Can you identify any extra precautions that
18   Mr. Ovalle, in your mind, should have taken?
19   A.    When you do a 360, you're -- you -- you are
20   taught to, you know, have your head and swivel -- look
21   all the way around, make sure where your footing is,
22   make sure where you're stepping to ensure that you
23   don't have an incident or an accident.
24   Q.    Right.  But my question is, can you identify
25   any specific things that you believe Mr. Ovalle should

125

1    have done in addition to using the squeegee?
2    A.    Other than awareness in the tasks that he was
3    doing, no.
4    Q.    Do you know the source of the water on the
5    floor?
6    A.    No.  My knowledge was that there was some
7    seepage because of the heavy rains that took place at
8    that time.
9    Q.    Okay.  Where was the seepage coming from?
10   A.    To my knowledge, it was coming from one of the
11   bay doors.
12   Q.    The garage door, right?
13   A.    Correct.
14   Q.    Are you aware that Mr. Ovalle had complained
15   about seepage through the garage bay door prior to the
16   day of this incident?
17   A.    No.
18   Q.    Are you aware of that now?
19   A.    Yes.
20   Q.    How are you made aware of that?
21   A.    Through some of the documents that I read.
22   Q.    If Mr. Ovalle would have complained about
23   water -- rainwater seeping through the garage bay door
24   and it creating a slip hazard, would you have expected
25   United Rentals to fix the problem?

126

1    A.    I would expect it to have some type of plan in
2    place to mitigate that hazard.
3    Q.    Do you have any evidence or did you become
4    aware of any efforts that United Rentals took to fix
5    or correct the water-seepage problem that Mr. Ovalle
6    identified it to?
7    A.    I wasn't aware there was a problem.  So, no.
8    Q.    So, you weren't aware of any efforts for them
9    to fix it?
10   A.    Correct.
11   Q.    You're not disputing that Mr. Ovalle reported
12   that problem, are you?
13         MR. WRIGHT:  Objection, form.
14   A.    It wasn't never brought up to -- to me.  It
15   was never an issue, even when -- during the time of
16   the accident.
17   Q.    (BY MR. HAYNES)  So, your testimony is that
18   Mr. Ovalle did not tell you where the rainwater came
19   from?
20         MR. WRIGHT:  Objection, form.
21   A.    Mr. Ovalle never told me that it was a -- was
22   an issue prior to the accident.
23   Q.    (BY MR. HAYNES)  Okay.  Do you know if he told
24   anybody at the Canyon facility whether the water
25   seepage was a problem prior to the incident?

127

1    A.    I'm not aware.
2    Q.    You can't dispute it, can you?
3    A.    I don't know if he did or not.
4    Q.    You're aware, based on the documents in this
5    case, that he indicated that he told people at the
6    facility that that was a problem prior to the day he
7    got hurt, right?
8    A.    Correct.
9    Q.    You can't dispute what he says, can you?
10         MR. WRIGHT:  Objection, form.
11   A.    I don't have no previous knowledge, no.
12   Q.    (BY MR. HAYNES)  Okay.  So, you can't dispute
13   that?
14         MR. WRIGHT:  Objection, form.
15   A.    Correct.
16   Q.    (BY MR. HAYNES)  But there's no doubt in your
17   mind that, if he had reported a problem like that,
18   that's something that United Rentals should have taken
19   action about, right?
20   A.    Correct.
21   Q.    Because that is a dangerous situation, isn't
22   it?
23         MR. WRIGHT:  Objection, form.
24   A.    It has the potential of being a hazard.
25   Q.    (BY MR. HAYNES)  And things that have a

128

1    potential to be a hazard can become a hazard if
2    nothing is done about it, right?
3    A.    Should be eliminated or mitigated.
4    Q.    So, yes?
5    A.    Yes.
6    Q.    All right.  Did your investigation reveal how
7    much water was on the floor?
8    A.    No.  It was revealed to me that it was a
9    puddle in the work area.
10   Q.    Was it one puddle?
11   A.    I don't recall.
12   Q.    Do you agree that Mr. Ovalle had to access
13   this room to do his work at United Rentals?
14         THE REPORTER:  I'm sorry.  I didn't hear
15   the last part.
16   Q.    (BY MR. HAYNES)  Do you agree with me that
17   Mr. Ovalle had to access this room to do his work at
18   United Rentals?
19   A.    Correct.
20   Q.    This is the room that he worked in, right?
21   A.    It's the bay that he worked in, yes.
22   Q.    Have you ever heard it referred to as the
23   generator shop?
24   A.    Yes.
25   Q.    Okay.  And sometimes equipment is housed in

129

1    the generator shop, right?
2    A.    Not necessarily.  It -- if it's in the shop,
3    it's because it's being worked on.
4    Q.    Okay.  And that's one of the things that
5    Mr. Ovalle did for a living, right?
6    A.    Correct.
7    Q.    He worked on equipment, right?
8    A.    Correct.
9    Q.    So, sometimes it is -- it's not uncommon to
10   see equipment being stored in the generator shop,
11   true?
12   A.    Correct.
13   Q.    All right.  Are you aware of any trip
14   protect -- protection or slip protection that was
15   deployed on the floor of the generator shop by United
16   Rentals prior to this incident?
17   A.    No.
18   Q.    Do you have any reasons why there was no trip
19   or slip protection deployed on the floor prior to this
20   incident?
21         MR. WRIGHT:  Objection, form.
22   A.    I -- I couldn't tell you.
23   Q.    (BY MR. HAYNES)  Do you have any idea of the
24   cost or the time or effort it would have taken to
25   deploy slip or trip protection on the floor of the

130

1  generator shop of this facility prior to this
2  incident?
3              MR. WRIGHT:  Objection, form.
4      A.  No, I couldn't tell you, no.
5      Q.  (BY MR. HAYNES)  Do -- do you have any reason
6  to believe it would have been cost prohibited or too
7  expensive to do that?
8              MR. WRIGHT:  Objection, form.
9      A.  No.
10     Q.  (BY MR. HAYNES)  After this incident took
11  place and you learned about the water seeping in from
12  the bay, the garage door, did you or anybody else at
13  United Rentals take any efforts to fix that problem?
14     A.  I believe Art and pumps looked at the
15  situation, and they looked at the -- the entrance of
16  the bay, did an inspection; and that was the extent of
17  it.  And they didn't -- to my knowledge, there was
18  nothing that was needed to be done from the bay area
19  going into the shop.
20     Q.  And that -- that knowledge is based on what
21  Art told you, right?
22     A.  Correct.
23     Q.  Did he tell you why the -- nothing needed to
24  be done to fix the problem?
25     A.  Something to do with the way the elevation,

131

1  the slope; and it was a unusual heavy rain that
2  occurred during that time frame when the water came
3  into the shop.
4      Q.  So, your testimony is that Mr. Silva said that
5  nothing needed to be done to fix the water seepage
6  into the United Rentals facility where Mr. Ovalle
7  slipped because the rain that generated the water on
8  which Mr. Ovalle slipped was unusually heavy?
9      A.  Repeat that one more time.
10     Q.  Sure.  Your testimony is that Mr. Silva told
11  you that nothing needed to be done about fixing the
12  water seepage problem into the garage door because --
13  which generated the water on which Mr. Ovalle slipped,
14  because that water was due to unusually heavy rains?
15     A.  Correct.
16     Q.  And to the best of your knowledge, Mr. Silva
17  said that -- well, strike.  New question.
18              Did you ask Mr. Silva if Mr. Ovalle had
19  ever complained about the water-seepage problem
20  before?
21     A.  No, it never came up as a previous issue.
22     Q.  It never came up during your investigation?
23     A.  Correct.
24     Q.  But it was never specifically asked, right?
25     A.  Correct.

132

1      Q.  You never asked Mr. Ovalle, "Hey, had this
2  happened before?"
3      A.  Correct.
4      Q.  You never asked Mr. Silva if it happened
5  before?
6      A.  Correct.
7      Q.  And the documents that would show whether or
8  not people were noting this problem pursuant to
9  monthly inspections are now gone?
10     A.  Correct.
11     Q.  And you have no reason to disbelieve
12  Mr. Ovalle when he says he complained about it before
13  the day he got hurt, right?
14              MR. WRIGHT:  Objection, form.
15     A.  I couldn't tell you if -- if he did or did
16  not.
17     Q.  (BY MR. HAYNES)  I mean, you're not going to
18  sit here and tell the jury he's lying, are you?
19              MR. WRIGHT:  Objection, form.
20     A.  I couldn't tell you if he did or he didn't
21  communicate that to his --
22     Q.  (BY MR. HAYNES)  And there's really no record
23  of it now, right?
24              MR. WRIGHT:  Objection, form.
25     A.  Not to my knowledge.

133

1      Q.  (BY MR. HAYNES)  Did you agree with
2  Mr. Silva's assessment that nothing needed to be done
3  to fix the issue because this was an unusually heavy
4  rain?
5      A.  I agreed with Mr. Silva.  I took his -- his
6  word on if something needed to be done, get it done;
7  but nothing needed to be done -- so -- according to
8  him.  So, yeah.
9      Q.  How did he define "unusually heavy rain"?
10     A.  He defined there was a -- there was some bad
11  weather came through, and they had unusual rain --
12  according to him, unusual rain for the area.
13     Q.  Was he from --
14     A.  Heavy rain.
15     Q.  -- the Panhandle?
16     A.  I'm not sure he's from there.  He works there.
17     Q.  Are you aware of the weather in the Texas
18  Panhandle?
19     A.  Not particularly.
20     Q.  Are you aware that the Texas Panhandle gets
21  very violent thunderstorms very frequently?
22              MR. WRIGHT:  Objection, form.
23     A.  I'm not aware.
24     Q.  (BY MR. HAYNES)  They frequently get violent
25  hailstorms, too.  Did you know that?

Michael Karabanoff - August 12, 2019

---

134

1    A.    No.
2    Q.    Is there any reason you didn't take any
3    additional effort to verify Mr. Silva's comment that
4    those are unusually heavy rains?
5    A.    He was the manager that was there present.  We
6    communicated with Ortegon and Carlos, the district
7    manager at the time; and we -- they agreed.  And so, I
8    agreed that nothing needed to be done and left it at
9    that.
10    Q.    All right.  Did Mr. Ovalle or anybody else at
11    the Canyon facility for that matter have to keep time
12    sheets or records of the work they were doing on a
13    day-in/day-out basis?
14    A.    No time sheets; but digitally, yes.
15    Q.    Okay.  Explain that.
16    A.    So, when they get there, they clock in; and as
17    they're working on a asset, a work order submitted, if
18    it takes an employee two hours to repair or maintain
19    that asset to get it ready, that time gets charged to
20    that asset.  That's how their time is disbursed.
21    Q.    Okay.  So, all the employees at the Canyon
22    facility had to clock in when they got to work and
23    started working, right?
24    A.    Correct.
25    Q.    All right.  And sometimes people get to work,

---

135

1    and they don't clock in immediately.  They may get a
2    cup of coffee or something, but eventually they will
3    clock in.  But that's the expectation, right?
4    A.    Correct.
5    Q.    Did you look at the clock-in records when you
6    were investigating this incident?
7    A.    No, I did not.
8    Q.    Do you agree that the clock-in records would
9    help us understand what time of day the incident
10    happened?
11    A.    There was no -- nothing indicated for me to
12    look at the records because the time of the incident
13    that was reported to me was documented.  Based on my
14    investigation, it was 2:00 o'clock in the afternoon.
15    Q.    Okay.  Would it have been difficult for you to
16    look at the time records?
17    A.    No.
18    Q.    You could have just punched them up on a
19    computer, right?
20    A.    The -- I would have got a printout from the
21    manager, from his direct supervisor.
22    Q.    That would have been easier, right?
23    A.    Yes.  Correct.
24    Q.    Are you aware of whether or not Mr. Ovalle
25    kept working that day after he got hurt?

---

136

1    A.    I believe he was working.
2    Q.    So, your belief is that he finished the day of
3    work?
4    A.    Correct.
5    Q.    Do you know when he first got medical
6    treatment?
7    A.    I'm not sure of the date.
8    Q.    Do you know if it was the same day?
9    A.    No, it wasn't the same day.
10    Q.    How do you know it wasn't the same day?
11    A.    Because when I got notified the next day,
12    Mr. Ovalle was at work.
13    Q.    And your testimony to the jury is that you
14    never told Mr. Ovalle to deny that he was injured,
15    right?
16    A.    Correct.
17    Q.    Your testimony to the jury is that you never
18    told Mr. Ovalle to not seek medical attention?
19    A.    Correct.
20    Q.    If Mr. Ovalle says that, he's lying?
21         MR. WRIGHT:  Objection, form.
22    A.    I never told him that.
23    Q.    (BY MR. HAYNES)  So, he would be lying?
24    A.    Correct.
25    Q.    All right.

---

137

1         THE REPORTER:  That will be No. 6.
2         (Karabanoff Exhibit No. 6 was marked)
3    Q.    (BY MR. HAYNES)  Do you recognize Exhibit 6?
4    A.    Yes.
5    Q.    What is that?
6    A.    This is a printout out of the U.R.S.S. system
7    when a report's generated.
8    Q.    Okay.  Is this the report that you've
9    generated as part of your investigation of this
10    incident that you've been mentioning today?
11    A.    Correct.
12    Q.    And it looks like it's a total of three pages?
13    A.    Correct.
14    Q.    It's got your name at the top, right?
15    A.    Correct.
16    Q.    It's got a case number, right?
17    A.    Correct.
18    Q.    What is the case number?  I mean, what -- what
19    does that mean exactly?
20    A.    The case number, the first four digits, the
21    year.
22    Q.    Uh-huh.
23    A.    The next three digits are the location code.
24    Q.    Uh-huh.
25    A.    And the next digit is just the number of

---

138

```
1   incidents that --
2       Q.  All right.  So, that's a unique number that
3   identifies this incident and everything related to it,
4   right?
5       A.  Correct.
6       Q.  All right.  And it lists Mr. Ovalle's name,
7   true?
8       A.  True.
9       Q.  It says the incident date and time is March
10  28, 2017, right?
11      A.  Correct.
12      Q.  And then it says "2:00 p.m.," correct?
13      A.  Correct.
14      Q.  And then it says the date reported to the
15  employer was March 28, 2017, right?
16      A.  Correct.
17      Q.  So, according to your investigation,
18  Mr. Ovalle reported it immediately, true?
19      A.  True.
20      Q.  And it says the "Report was created on August
21  8, 2019," right?
22      A.  Say that one more time.
23      Q.  Sure.  If you go to the right, it says,
24  "Report created on August 8, 2019"?
25      A.  No.  The report was created a week after the
```

139

```
1   incident.
2               MR. HAYNES:  Objection, nonresponsive.
3       Q.  (BY MR. HAYNES)  On Exhibit 6 it says, "Report
4   created August 8, 2019," true?
5       A.  That's what it says.  Correct.
6       Q.  Okay.  And why does it say, "Report created on
7   August 8, 2019"?
8       A.  For some reason when you print out of the
9   system, it puts the date that you print it, not the
10  date you create it.
11      Q.  Okay.  So, your testimony is that you created
12  this report, Exhibit 6, within a week of the incident
13  back in March of 2017, right?
14              MR. WRIGHT:  Objection, form.
15      A.  A week after the incident.  Correct.  Yes.
16      Q.  (BY MR. HAYNES)  And for some reason it says
17  that this report was created on August 8, 2019, right?
18              MR. WRIGHT:  Objection, form.
19      A.  Correct.
20      Q.  (BY MR. HAYNES)  And the brief description
21  says, "Employee was using a squeegee to remove water
22  from bay when he slipped and fell," right?
23      A.  Correct.
24      Q.  That is the sum total of the information you
25  provided regarding what happened, based on your
```

140

```
1   interview of three people, right?
2       A.  Correct.
3               MR. WRIGHT:  Objection, form.
4       Q.  (BY MR. HAYNES)  And it notates that
5   Mr. Ovalle cleaned this area daily, correct?
6       A.  Correct.
7       Q.  Do you have any evidence or belief that
8   Mr. Ovalle, prior to this incident, had not maintained
9   proper housekeeping of his work area?
10      A.  No.
11      Q.  And your testimony is that -- well, strike.
12  New question.
13              If you go up -- up further.  Sorry.  I
14  overlooked this.  It says "Time injured began to work"
15  is "7:00 a.m.," right?
16      A.  Correct.
17      Q.  And so, your testimony to the jury is that
18  Mr. Ovalle began working at 7:00 a.m. and worked until
19  2:00 p.m. in the afternoon and was able to avoid
20  slipping and falling on water for six hours?
21      A.  Correct.  From 7:00 to 2:00.
22      Q.  Seven hours.  I'm sorry.  Seven hours, right?
23      A.  Whatever 7:00 to 2:00 is, yes.  From 7:00 in
24  the morning to 2:00 in the afternoon.
25      Q.  That's right.
```

141

```
1               So, seven hours after Mr. Ovalle had
2   been working at this facility in this generator shop
3   with this same water on the floor that had come there
4   the night before from heavy rain or before his shift,
5   he was able to avoid it, right?
6               MR. WRIGHT:  Objection, form.
7       A.  I'm not aware that there was water prior to
8   the incident that morning.  I couldn't tell you.
9       Q.  (BY MR. HAYNES)  Well, I mean, did your
10  investigation reveal when this rain took place, this
11  unusually heavy rain?
12      A.  The night before.
13      Q.  Okay.  So, did your investigation reveal that
14  the water on the floor must have been there when
15  Mr. Ovalle appeared for work at 7:00 a.m. that
16  morning, given that the rain came from the sky the
17  night before?
18              MR. WRIGHT:  Objection, form.
19      A.  I addressed the -- the incident that occurred
20  at 2:00 o'clock; and that's when my investigation
21  started, what took place at that time.
22      Q.  (BY MR. HAYNES)  Did you undertake any effort
23  to determine when the water got there?
24      A.  No.  My concern was what happened at 2:00
25  o'clock.
```

142

1    Q.   Well, doesn't when the water got there pertain
2    to why it was there and why it wasn't cleaned up?
3        A.   He was cleaning it up in the process when he
4    fell.  He was mitigating the problem when -- when he
5    fell.
6        Q.   Right.  But didn't you ask him how or why it
7    took him, according to you, seven hours to begin to
8    clean up rainwater from heavy rain the night before?
9                 MR. WRIGHT:  Objection, form.
10       A.   No.  He's always kept a clean bay.  So,
11   there -- I didn't ask him because he's -- he always
12   keeps a clean bay.  He recognized a hazard at that
13   time and mitigated that hazard.
14       Q.   (BY MR. HAYNES)  So, it doesn't strike you as
15   unusual that Mr. Ovalle was somehow able to work for
16   seven straight hours and avoid rainwater on the
17   ground; and then at the seventh hour almost on the
18   dot, he slips on the rainwater --
19                 MR. WRIGHT:  Objection, form.
20       Q.   -- (BY MR. HAYNES) when he begins to start
21   cleaning it?
22       A.   Mr. Ovalle's not assigned particularly to that
23   bay.  There's other duties that he does, whether it be
24   in the yard getting equipment ready, tagging
25   equipment, helping customers out, identifying parts,

143

1    doing inventory.  There's other tasks that he may have
2    been doing that -- that morning.
3        Q.   Okay.  You agree that United Rentals should
4    not restrict its employees from using whichever door
5    they feel is the most safe to access the facility,
6    right?
7        A.   Correct.
8        Q.   If there was a policy like that, that would be
9    an unsafe policy, right?
10                 MR. WRIGHT:  Objection, form.
11       A.   Correct.
12       Q.   (BY MR. HAYNES)  If you go to the second page,
13   please.  This is a section that's describing the
14   Causal Factors --
15       A.   Uh-huh.
16       Q.   -- true?
17       A.   True.
18       Q.   And the -- the first sentence that you wrote
19   down was, "The shop bay that the employee was cleaning
20   was wet due to heavy rains that day," right?
21       A.   Correct.
22       Q.   So, that doesn't say "night before."  That
23   says "day."
24       A.   Correct.
25       Q.   So, you testified earlier that the heavy rains

144

1    came the night before.
2        A.   Correct.
3        Q.   So, did they continue throughout the day?
4        A.   I don't recall.
5        Q.   Okay.  So, I mean, do you know why you wrote
6    down "day" right there?
7        A.   No, I don't.
8        Q.   And then you said, "The floor has a coat of
9    paint that makes the floor slick when wet," correct?
10       A.   Correct.
11       Q.   The fact that this floor had a coat of paint
12   that made it slick when wet was something that United
13   Rentals knew for a long time, right?
14                 MR. WRIGHT:  Objection, form.
15       A.   When you have a surface that's covered with
16   paint, it becomes slipperier when wet.
17       Q.   (BY MR. HAYNES)  And that's something United
18   Rentals knew long before the day this happened, right?
19                 MR. WRIGHT:  Objection, form.
20       A.   We knew there was paint on the floor, yes.
21       Q.   (BY MR. HAYNES)  And that it could be slick
22   when wet, right?
23       A.   Correct.
24       Q.   When you wrote that the floor was wet due to
25   heavy rains that day, did you ask anyone why heavy

145

1    rains outside an enclosed premises would make a floor
2    inside the premises wet?
3        A.   Yes.
4        Q.   What did they say?
5        A.   That due to the heavy rains, it seeped through
6    under the -- the bay door; and water came in through
7    the bay, which is what, my understanding, occurred
8    when Mr. Ovalle had the incident.
9        Q.   Do you agree that United Rentals should not
10   have a facility that allows rainwater to seep in and
11   create slippery floors?
12       A.   I agree.
13       Q.   And then it says, "What was the underlying
14   cause of the accident?"
15                 And you say, "Employee was preparing the
16   area for safe work by removing the water from the bay
17   when he slipped and fell," right?
18       A.   Right.
19       Q.   And then you say, "What failure in the safety
20   management system resulted in the immediate and
21   underlying cause of the accident?"  That's the next
22   question down there, right?
23       A.   Uh-huh.
24       Q.   Yes?
25       A.   Yes.

146

1    Q.   All right.  And so, first of all, what is the
2  safety management system?
3    A.   That is our H.E.S. -- H.S.E.S. manual that we
4  talked about earlier.
5    Q.   That's the thing that the branch manager and
6  division manager are responsible for enforcing, right?
7    A.   Correct.
8    Q.   Okay.  And this is asking what failure in that
9  system resulted in the cause, which was him slipping
10 on the floor, right?
11   A.   Correct.
12   Q.   And it says "Unclear/Missing/Wrong Policy or
13 Procedure," true?
14   A.   True.
15   Q.   So, pursuant to your investigation, you found
16 as the -- basically the cause of the cause was an
17 unclear and missing or wrong policy or procedure,
18 true?
19   A.   True.
20   Q.   Could you explain what you mean by
21 "Unclear/Missing/Wrong Policy or Procedure"?
22   A.   When Mr. Ovalle was cleaning, it was not clear
23 to me exactly what he was doing; and if it was a -- if
24 it was an ongoing issue at that bay.  Mr. Ovalle never
25 brought that to my attention or, to my knowledge, to

147

1  Art's attention.
2    Q.   Okay.  How is that a failure of the safety
3  management system enforced by the -- by you and
4  Mr. Silva and others?
5    A.   It was -- it was unclear.  To me, it was
6  unclear what -- what occurred, what -- if it was
7  ongoing, if it was -- you know, it was unclear who was
8  at fault here.  It was -- he was mitigating the
9  hazard, right?  He was -- he identified the hazard.
10 He was mitigating the hazard; and while doing so, he
11 slipped and fell.  While trying to create a -- a safe
12 work area, he slipped and fell.
13   Q.   And you don't fault him for that, do you?
14   A.   I don't fault him; but as we're doing the
15 task, not only at the beginning but during the task,
16 we train our employees to ensure they're doing 360 at
17 all times.  Could have been his footing.  Could have
18 been -- you know, any of those factors could have
19 played a role in him slipping and falling.
20   Q.   You don't have any evidence that he was being
21 unsafe, do you?
22   A.   I do not.
23   Q.   And do you agree that United Rentals should
24 not put its employees in a position to where they're
25 trying to clean up unusually heavy rainwater that has

148

1  seeped into the facility because of some problem with
2  the facility using only a squeegee?
3        MR. WRIGHT:  Objection, form.
4    A.   We train our employees to eliminate or
5  mitigate hazards that are identified, and that's what
6  Mr. Ovalle was doing.
7    Q.   (BY MR. HAYNES)  He did exactly what you asked
8  him to do, didn't he?
9    A.   He was mitigating the hazard.
10   Q.   Which is exactly what you wanted him to do,
11 right?
12   A.   Correct.
13   Q.   And he is not the one that created the
14 rainwater, right?
15   A.   Correct.
16   Q.   He has no authority to fix the garage door or
17 the sump or whatever the reason was that the rainwater
18 had seeped into the facility, right?
19   A.   He has stop-work authority.  He's empowered to
20 stop what he's doing if he feels that he is in harm's
21 way.
22   Q.   If Mr. Ovalle had previously reported this
23 problem to a management, don't you think that counts
24 as stop-work authority?
25        MR. WRIGHT:  Objection, form.

149

1    A.   I was not aware that it was reported.
2    Q.   (BY MR. HAYNES)  But what -- I'm asking you to
3  assume that he reported it before.  Isn't that a form
4  of stopping work, trying to say, "This is a problem.
5  We need to do something about it"?
6    A.   Correct.
7    Q.   So, you don't fault Mr. Ovalle for, previous
8  to this day, trying to stop work and correct the
9  problem, do you?
10        MR. WRIGHT:  Objection, form.
11   A.   Say that one more time.
12   Q.   (BY MR. HAYNES)  You don't fault Mr. Ovalle
13 for, prior to this day, reporting this issue to people
14 at his branch and asking them to fix it, do you?
15   A.   No, I don't fault him.
16   Q.   And at that point it would become the
17 responsibility of the branch manager to make sure that
18 it got fixed, right?
19        MR. WRIGHT:  Objection, form.
20   A.   It was the branch manager's responsibility to
21 ensure some type of mitigation, you know, a plan,
22 whether it be different tool, like a squeegee, or some
23 kind of place to fix the area if there was an issue,
24 yes.
25   Q.   (BY MR. HAYNES)  The manager shouldn't have

Michael Karabanoff - August 12, 2019

150

1  ignored the request, right?
2      A.    Correct.
3      Q.    And Mr. Ovalle doesn't have any authority to
4  just go out there and start building additional sumps
5  or, you know, doing things like that to -- to modify
6  the structure of the building, does he?
7      A.    No, he does not.
8      Q.    He'd have to get approval for that, wouldn't
9  he?
10     A.    Correct.
11     Q.    And he would have to do that by reporting the
12  incident in the first place or the issue in the first
13  place to management, right?
14     A.    Correct.
15     Q.    And then he would have to hope that they would
16  help him fix the problem, right?
17     A.    Get somebody to -- if there was a problem, get
18  somebody to work on that issue.
19     Q.    So, I want to drill down a little bit about
20  what you mean under the question of what -- what
21  failure in safety management.  It's talking about
22  policies and procedures, right?
23          MR. WRIGHT:  Objection, form.
24     Q.    (BY MR. HAYNES)  That's the word you use,
25  true?

151

1      A.    What's that?  Yes, in here.
2      Q.    So, you use the word "policies and
3  procedures," right?
4      A.    Yes.
5      Q.    And you also say that those policies and
6  procedures were unclear, missing or wrong, true?
7          MR. WRIGHT:  Objection, form.
8      A.    True.
9      Q.    (BY MR. HAYNES)  So, what policies and
10  procedures were unclear, missing or wrong?
11     A.    The routine.  I was not familiar of the
12  routine or Mr. Ovalle was not familiar with the
13  routine of what took place.  In other words, I was
14  unclear if this was an ongoing issue.  I was unclear
15  if the -- this was a problem at the branch; and to my
16  knowledge, that was never brought to my attention by
17  neither Mr. Ovalle or Art.
18     Q.    So, I want to make sure I'm clear.  You
19  testified earlier that you never asked Mr. Ovalle if
20  this had been a problem before he got hurt, right?
21     A.    Correct.
22     Q.    And you never asked Mr. Silva if this was a
23  problem before the day Mr. Ovalle got hurt, right?
24     A.    Right.
25     Q.    But your answer is that it was unclear to you

152

1  if this was a problem before the day Mr. Ovalle got
2  hurt?
3      A.    It was never -- it was never brought up.
4      Q.    Okay.  Well, Mr. Karabanoff, why didn't you
5  ask them, if it was unclear to you, if you were
6  investigating this incident on behalf of United
7  Rentals as one of its chief safety officers?
8      A.    I didn't ask them at the time of the
9  investigation, one, Mr. Ovalle was already in the
10  hospital.  So, I -- he was not in the proper state to
11  have this conversation.  And then one thing led to
12  another, and that was -- as you can see on the
13  document, it's still -- the investigation's still open
14  because it was not completed because I couldn't get
15  ahold of Mr. Ovalle after the fact.
16     Q.    Where does it say it's still open?
17     A.    I guess it didn't print; but in the system,
18  this incident's still open, gathering --
19     Q.    So, you're still investigating?
20     A.    There was -- I couldn't talk to Mr. --
21  Mr. Ovalle.  So, I never -- it was never finalized.
22     Q.    But you testified to me that you did interview
23  Mr. Ovalle.
24     A.    Yes, but -- initially, right?  So, we got the
25  gist; and when I had additional questions, I didn't

153

1  talk to Mr. Ovalle.  He was already in the hospital.
2      Q.    When he got out of the hospital, did you talk
3  to him?
4      A.    No.
5      Q.    Why not?
6      A.    I didn't talk to him.
7      Q.    The question is why?
8      A.    I didn't know where he stood.  I didn't know
9  if he was coming back to work.  He was not working at
10  the time.
11     Q.    Does the United Rentals incident investigation
12  policy say that you're only supposed to follow up on
13  investigations and close them out if the employee's
14  coming back to work for you?
15     A.    No, it does not.
16     Q.    So, that's not a valid reason for not having
17  talked to him, is it?
18     A.    At that time, I don't know if he was working.
19  He wasn't working for us.  He was at home.  I was not
20  going to -- I didn't call him and bother him at home
21  while he was off.
22     Q.    But you did bother him in the hospital?
23     A.    What's that?
24     Q.    You did bother him in the hospital?
25     A.    Beginning -- at the beginning, I called to

154

1  check on him; and that was the extent of it.  And he
2  was under care.  So, I did not discuss the incident.
3      Q.  So, I'm trying -- I'm not trying to quibble
4  with you.  I'm trying to understand the facts.  Is it
5  your testimony that you were never asked Mr. Ovalle during
6  an interview about what happened?
7      A.  No.  I did ask him what happened.  When I had
8  follow-up questions -- once I got the information from
9  Mr. Ovalle, I had follow-up questions, right?  He was
10  already in the hospital.  So, I never asked those
11  follow-up questions.  But the initial statement that I
12  got from him, the story that I got from him is what I
13  got -- what I have here.
14      Q.  So, there could be information that exists
15  about this incident that completely clears Mr. Ovalle,
16  right?
17              MR. WRIGHT:  Objection, form.
18      A.  Say that one more time.
19      Q.  (BY MR. HAYNES)  Yeah.  There could be
20  information that exists that completely clears
21  Mr. Ovalle from any fault or responsibility, right?
22      A.  I couldn't tell you.  I don't know.
23      Q.  Well, because you haven't followed up with
24  him, right?
25      A.  He was -- he wasn't working at the time.

155

1      Q.  I know, which means you -- there could be
2  information that he possesses that could shed light on
3  additional reasons why this incident happened, right?
4      A.  There could -- there could be additional
5  information, yes.
6      Q.  And you only interviewed Mr. Silva one time,
7  right?
8      A.  Mr. Silva?  Yes.
9      Q.  And you only interviewed the technician one
10  time, right?
11      A.  The technician one time, yes.
12      Q.  Do you think that -- well, strike.
13          So, your investigation of this incident
14  is incomplete?
15      A.  I couldn't -- I didn't talk to Mr. Ovalle
16  after the fact.
17      Q.  Do you know what Mr. Ovalle has said happened,
18  based on your involvement in this lawsuit?
19      A.  Based on what I saw in the document, yes.
20      Q.  Well, what does he say happened?
21      A.  According to the document, he says he was
22  walking in early in the morning; and the incident
23  occurred early in the morning.  It was dark, and he
24  slipped and fell.
25      Q.  Does that change your analysis?

156

1              MR. WRIGHT:  Object to form.
2      A.  Explain.
3      Q.  (BY MR. HAYNES)  Does that change your
4  analysis, your investigation of what happened?
5              MR. WRIGHT:  Objection, form.
6      A.  It could, right, because it's not the same
7  incident.  It's not what was reported to me.
8      Q.  (BY MR. HAYNES)  But we don't have a record of
9  what he actually said because that's gone, right?
10              MR. WRIGHT:  Objection, form.
11      Q.  (BY MR. HAYNES)  Your handwritten notes of
12  your interview with Mr. Ovalle are gone, true?
13      A.  Correct.
14      Q.  All we have is this three-page document that
15  doesn't list anybody that was interviewed, right?
16      A.  There's also a -- he reported to the nurse
17  hotline.  So, that's --
18      Q.  He reported to the nurse two weeks later,
19  right?
20      A.  I'm not sure when -- when he called but --
21      Q.  Well, you're -- you know it wasn't the day of,
22  right?
23      A.  Correct.
24      Q.  And you -- your testimony under oath is that
25  you don't know why he waited two weeks to go to seek

157

1  medical attention, right?
2      A.  Correct.
3      Q.  And you definitely never told him not to seek
4  medical attention?
5      A.  Correct.
6      Q.  Because that would violate United Rentals'
7  policies, right?
8      A.  Correct.
9      Q.  And that would be wrong?
10      A.  Yes.
11      Q.  Do you know someone named Justin?
12      A.  Justin, I believe, is the branch manager on
13  the pump side, I believe.
14      Q.  Did this facility in Canyon have two branch
15  managers?  In other words -- I mean, I know we have
16  the kind of unusual set of two people serving as the
17  branch manager role; but was there another branch
18  manager at that facility?
19      A.  For a different division, yes.
20      Q.  Okay.  And that person's name was Justin,
21  right?
22      A.  I believe so, yes.
23      Q.  Did Justin have any supervisory authority over
24  Mr. Ovalle?
25      A.  He was the -- not supervisor.  No, he wasn't

158

1   his direct report, no.
2        Q.   Okay.  Did you interview Justin?
3        A.   Art did.
4        Q.   Okay.  Why did you not interview Justin?
5        A.   Justin was not a witness.  He did not see
6   Mr. Ovalle fall.  Justin heard about it from
7   Mr. Ovalle and reported it to Art, and I was dealing
8   with Art since he was the operations manager for
9   power/HVAC.
10       Q.   Do you have any record of what Justin told
11  Art?
12       A.   That Mr. Ovalle had fallen.  That afternoon he
13  went to report it to Justin.  Justin asked him how he
14  was.  Mr. Ovalle said that he was fine, just wanted to
15  let somebody know that he had fallen but that he was
16  fine.  And that's what was relayed to me from -- from
17  Art the next day.
18       Q.   Okay.  Are you aware that what you just said
19  conflicts with what he told the nurse?
20            MR. WRIGHT:  Objection, form.
21       A.   Yes.
22       Q.   (BY MR. HAYNES)  Okay.  How do you make heads
23  or tails of that?  I mean, as an investigator for
24  United Rentals for safety incidents, what do you do
25  when there are conflicting statements?

159

1            MR. WRIGHT:  Objection, form.
2        A.   As far as when there's conflicting statements
3   from the nurse to what was actually said to us,
4   it's -- it's investigated because that document goes
5   straight to claims.  So, it's investigated by claims.
6   They -- that --
7            THE REPORTER:  7
8            (Karabanoff Exhibit No. 7 was marked)
9        Q.   (BY MR. HAYNES)  Okay.  I handed you Exhibit
10  7.  Do you recognize that?
11       A.   I recognize this because it was part of the
12  package.  We were not -- this is the -- we're not
13  privileged to see this.  This goes to the claims
14  department.  The first time I saw this document was
15  when it was presented to me.
16       Q.   To prepare for your deposition?
17       A.   Correct.
18       Q.   By a lawyer?
19       A.   Correct.
20       Q.   You have never seen this document prior to
21  getting ready for this deposition?
22       A.   Correct.
23       Q.   And you agree that this document contains at
24  least a record from the nurse of what Mr. Ovalle told
25  her a few weeks after the incident took place, right?

160

1        A.   Correct.
2        Q.   And Mr. Ovalle -- at the bottom of the first
3   page, there's a paragraph; and it's called
4   "Description of Incident."  Do you see that?
5        A.   Yes.
6        Q.   And in the third sentence Mr. Ovalle tells
7   her, "I've told them that they should do something
8   about that because it is so dangerous"; and he's
9   referencing water coming under the door inside the
10  building, right?
11       A.   Uh-huh.
12       Q.   Right?
13       A.   Yes.  I'm reading.
14       Q.   You don't have any reason to dispute that
15  Mr. Ovalle had told people at the Canyon facility
16  prior to the day of this incident that water came
17  under the garage door inside the building, right?
18       A.   Right.
19       Q.   And to your knowledge, they did nothing about
20  it, correct?
21            MR. WRIGHT:  Objection, form.
22       A.   I was never -- I didn't know it was an issue.
23  So --
24       Q.   (BY MR. HAYNES)  But -- which means, to your
25  knowledge, no one at the facility did anything to

161

1   correct that problem, right?
2        A.   Correct.
3            MR. WRIGHT:  Objection, form.
4        Q.   (BY MR. HAYNES)  And you -- you agree that is
5   a problem, right?
6            MR. WRIGHT:  Objection, form.
7        A.   Yes.
8        Q.   (BY MR. HAYNES)  Water is not supposed to seep
9   under your garage door and come into United Rentals'
10  facility, true?
11       A.   True.
12       Q.   That's dangerous, isn't it?
13       A.   Potentially, yes.
14       Q.   All right.  Mr. Ovalle also says that he "got
15  up and went to Justin, the manager of the pumps, and
16  told him what happened.  He didn't have me report it
17  or anything."  Right?
18       A.   I see that.
19       Q.   Is that consistent with what you understood
20  Justin's position to be, based on your investigation?
21       A.   No.  He -- Justin reported it to Art once
22  Ovalle reported it to Justin, and that was the extent
23  of it.
24       Q.   So -- so, that would mean that Justin reported
25  it to Art the same day, correct?

Michael Karabanoff - August 12, 2019

42 (Pages 162 to 165)

---

162

1    A.    Don't recall if it was the same day or the
2    next day.
3    Q.    Well, according to Mr. Ovalle's statement
4    here -- and, again, this is a statement that is
5    written down by a nurse.
6    A.    Correct.
7    Q.    There's no, to my knowledge, recorded
8    statement.  There's no transcript of actual words that
9    Mr. Ovalle said during this time; but this is what
10   somebody else says he said.  And they say that
11   Mr. Ovalle told her that he got up immediately and
12   went and told Justin what had happened; and Justin did
13   not have him report it, right?
14   A.    Right.
15   Q.    So, that would be the same day that he
16   reported it to Justin, true?
17   A.    True.
18   Q.    And if Justin was being truthful with Art,
19   then Justin would have told Art the same day, right?
20   A.    True.
21   Q.    And the presumption is that Art would have
22   told you the same day, right?
23   A.    Correct.
24   Q.    That's your expectation, true?
25   A.    True.

---

163

1    Q.    But you know for a fact that you were not told
2    the same day it happened, right?
3    A.    Correct.
4    Q.    And Mr. Ovalle, according to the nurse, also
5    says that "There was someone there doing an audit for
6    safety.  She was there when I told Justin, and she
7    didn't say anything either.  So, I just went back to
8    work."  Right?
9    A.    I see that.
10   Q.    Do you know who was there doing an audit for
11   safety?
12   A.    No, it wasn't a -- it wasn't a safety -- if it
13   was a safety audit that was being conducted, it would
14   have been one of my colleagues.  It would have been
15   another safety person, and there was no safety person
16   present there.
17   Q.    Do you have any idea who he might have been
18   referencing here?
19   A.    It could have been another employee doing a
20   walk-around.  I'm not sure.  Could have been --
21   Q.    Okay.
22   A.    -- somebody else.
23   Q.    But he doesn't know the person's name.  So,
24   isn't -- the presumption is that it's someone that
25   didn't work at the Canyon facility that had come

---

164

1    there --
2    A.    Correct.  Correct.
3    Q.    -- right?
4             So, you have no idea who that could have
5    been?
6    A.    No.
7    Q.    All right.  Are you denying that somebody was
8    there conducting a safety audit?
9    A.    No, I'm not.
10   Q.    Would there be a record in the digital system
11   of United Rentals as to who was there that day
12   conducting a safety audit?
13   A.    I'm not sure there was a safety audit they
14   were conducting.  So, I'm not sure what they were
15   doing there.  Could have been something else.
16   Q.    But if we take Mr. -- or at least the nurse's
17   word for what Mr. Ovalle said, they were doing some
18   kind of safety audit, right?
19   A.    It should be in -- the only safety audit that
20   would have been recorded would have been an internal
21   audit, which would be in the system.
22   Q.    Okay.  That's not part of those hard-copy
23   documents we talked about earlier?
24   A.    No.
25   Q.    So, there were internal safety audits that

---

165

1    were kept digitally?
2    A.    Internal?  Yes.
3    Q.    How often were those done?
4    A.    Those are the audits that we talked about
5    earlier that were done once a year.
6    Q.    Oh, okay.  I thought you meant internally to
7    the facility.
8    A.    No, no, no.
9    Q.    Okay.  So, Mr. Ovalle explains, according to
10   the nurse, that he worked with pain the rest of the
11   day.  The next morning he basically had to talk to
12   Art, his boss, because the pain was worse, right?
13   A.    Uh-huh.
14   Q.    Yes?
15   A.    Yes.
16   Q.    Okay.
17   A.    See that.
18   Q.    And Art was out of town; and he indicates that
19   Art told you what had happened, right?
20   A.    Correct.
21   Q.    And Mr. Ovalle indicates that he talked to you
22   that morning, right?
23   A.    Correct.
24   Q.    And he says that you told him to basically try
25   to walk it off, right?

---

166

1    A.    That's what it says here, but that's not what
2    I said.
3    Q.    And you're denying that you told Mr. Ovalle
4    the next day to just walk it off?
5    A.    Correct.
6    Q.    You're denying that you told Mr. Ovalle not to
7    seek medical attention?
8    A.    Correct.
9    Q.    All right.  You're denying that you even
10   talked to him that day, right?
11        MR. WRIGHT:  Objection, form.
12   A.    I talked to him the next day.
13   Q.    (BY MR. HAYNES)  I thought you said you talked
14   to him when he was in the hospital?
15        MR. WRIGHT:  Objection, form.
16   A.    I talked to Mr. Ovalle the next day when he
17   told me what happened.
18   Q.    (BY MR. HAYNES)  Okay.  I need to make sure
19   I'm clear, and maybe I'm jumbling it.  I'm sorry if I
20   am.
21   A.    Okay.
22   Q.    I thought you told me earlier the first time
23   you talked to him, he was in the hospital?
24        MR. WRIGHT:  Objection, form.
25   A.    No, no, no, no, no.

167

1    Q.    (BY MR. HAYNES)  Okay.  Let's go through it.
2    After this incident happened, when was the first time
3    you talked to Mr. Ovalle about anything?
4    A.    The next day.
5    Q.    That was by phone?
6    A.    By phone.
7    Q.    What time of day?
8    A.    I don't recall, but it was the next day.
9    Q.    Did he call you, or did you call him?
10   A.    He called me.
11   Q.    Did he use a cell phone number?
12   A.    I believe so.
13   Q.    Do you know where he was physically located
14   when he called you?
15   A.    No.
16   Q.    Did he tell you --
17   A.    Oh, he was at work.  He was at work.
18   Q.    Okay.  Did he call your office number?
19   A.    No, no.  He had my cell number.
20   Q.    Do you know how he got your cell number?
21   A.    Could have been posted in -- at the branch.
22   Art could have gave -- there's numerous ways that it
23   could happen.
24   Q.    Okay.  How long did the conversation last?
25   A.    I don't recall.

168

1    Q.    And this is when you say he gave you a basic
2    explanation of what had happened, right?
3    A.    Correct.
4    Q.    Did you ask him if he was hurt?
5    A.    Yes.
6    Q.    What did he tell you?
7    A.    He said that he was under a little bit of
8    pain, but he was going to be okay.  He just wanted to
9    report it.  Same thing that he told Justin and Justin
10   told Art.
11   Q.    What did you say?
12   A.    I said, "There's the 877 U.R.I. risk number.
13   If you feel that you need to go to a hospital or you
14   need attention, you need to call them and report the
15   incident to them; and they'll give you further
16   instructions on what to do."  And he agreed.
17   Q.    So, you left it up to him as to whether he was
18   going to call?
19   A.    Correct.
20   Q.    You didn't instruct him to call?
21   A.    I explained to him that -- according to him,
22   he was fine at the time; and I told him here was an --
23   "Here's an option.  You need to call them if -- if you
24   feel you need to."
25   Q.    And during this time, you were taking

169

1    handwritten notes?
2    A.    No, because there was -- he was fine at the
3    time when we talked.
4    Q.    Okay.  Did you ever take handwritten notes of
5    your discussions with Mr. Ovalle?
6    A.    Whenever I was doing the -- the investigation,
7    yes, but not during those phone call conversations.
8    There was nothing for me to take notes of.  We were
9    just walking through the process.  He never told me
10   that he was in pain or that he needed to go to the
11   doctor.  I told him the -- processes.  Here's the
12   U.R.I. risk, and that was the extent of it.
13   Q.    So, at that time, it was a near miss?
14   A.    Yes.
15   Q.    And you have a duty to report near misses so
16   they can be investigated and you can mete out
17   corrective action, right?
18   A.    The manager has, yes.  Correct.
19   Q.    So, you should have taken notes about what he
20   was saying because it was a near miss; and somebody
21   had to report that, right?
22   A.    The employee.  He has access to the system.
23   Q.    But you -- you're the safety director.  You
24   had become aware that an employee had slipped on water
25   that came through the garage door because of rainwater

170

1  outside a United Rentals facility and he was reporting
2  pain and you're telling me that you couldn't have
3  initiated the near-miss reporting process?
4      A.  I didn't -- I didn't initiate it.
5      Q.  Could you have?
6      A.  Yes.
7      Q.  Nothing prevented you from, right?
8      A.  No.
9      Q.  If safety's your No. 1 priority, shouldn't you
10  have just reported it as a near miss to be safe?
11      A.  I guess.  Put it in the system.
12      Q.  And then you talked to Mr. Ovalle again,
13  right, after that?
14      A.  I don't recall.  I -- no, I don't remember if
15  it was that same day or not.
16      Q.  I'm just asking -- I'm not saying the same
17  day.  I'm just saying you -- after Conversation No. 1,
18  which was the day after, where you talked to him
19  briefly about what had happened, you took no notes and
20  you did not report it as a near miss, you talked to
21  him a second time, right?
22      A.  At some point, yes.
23      Q.  And you don't know when?
24      A.  No.
25      Q.  And that was another phone call?

171

1      A.  Correct.
2      Q.  And this time Mr. Ovalle was in the hospital,
3  right?
4      A.  I think I talked to him before that.
5      Q.  Okay.  During this conversation, tell me what
6  happened.
7      A.  He was saying that he was still in pain; and,
8  again, I gave him the -- the number.  I believe it
9  was -- I don't know.  It was closer to -- towards the
10  end of the week, I believe; and I gave him the risk
11  number.  I explained to him the process of -- of the
12  nurse hotline.  And he said that he would go home for
13  the weekend, and he would circle back with me Monday
14  if he needed to call.
15      Q.  Okay.  At that point did you report it as a
16  near miss?
17      A.  No, I did not.
18      Q.  Even though it counted as one?
19      A.  True.
20      Q.  Okay.  Did you take any handwritten notes
21  during that conversation?
22      A.  No.
23      Q.  All right.  Then did you talk to him again?
24      A.  I don't know if I talked to him that Monday or
25  Art.  I talked to Art; and Ovalle called the nurse

172

1  hotline at that point, I believe, if I recall
2  correctly.  Then the nurse instructed him to go seek
3  medical help, whether -- I can't remember whether he
4  sent -- it was to the doctor or clinic or E.R.  I'm
5  not sure.
6      Q.  So, in Conversation No. 2, did you ask him any
7  additional details about what had happened?
8      A.  No.
9      Q.  Okay.  And in Conversation No. 2, he was not
10  in the hospital, right?
11      A.  Correct.
12      Q.  Conversation No. 3, did you ask him any
13  additional details about what had happened?
14      A.  No.
15      Q.  And in Conversation No. 3, he also was not in
16  the hospital?
17      A.  I don't remember Conversation No. 3, if it
18  was -- if I communicated with Art or Mr. Ovalle; but
19  that's when he proceeded to call the nurse hotline.
20      Q.  Okay.  It's true that you never spoke to
21  Mr. Ovalle when he was in the hospital, right?
22      A.  No.  I spoke to him one time when he was in
23  the hospital.
24      Q.  All right.  So, there's a fourth time you
25  talked to him?

173

1      A.  I don't recall the third time.  I don't recall
2  if it was -- if I talked to Ovalle or I talked to Art
3  the third time.
4      Q.  Well, Mr. Ovalle says in Exhibit 7 that he
5  called you again on Monday and told you he was still
6  in pain; and you finally told him to call the nurse
7  hotline.
8      A.  Again, I don't remember if -- if I had the
9  conversation with Mr. Ovalle or I talked to Art.
10      Q.  Okay.  Well, if you don't remember, you can't
11  dispute what he's saying, can you?
12      A.  Correct.
13      Q.  So, after this third conversation, you had a
14  fourth subsequent conversation; and that is when
15  Mr. Ovalle was in the hospital, right?
16      A.  Correct.
17      Q.  Okay.  What did you talk about then?
18      A.  I was just checking on him, see how he was
19  doing, just checking on him.  That's the extent of it.
20      Q.  Did you ask him what happened then?
21      A.  No.
22      Q.  So, you had three subsequent phone calls to
23  Mr. Ovalle after the one you had the day after the
24  incident; and you never asked him any additional
25  details about what happened?

174

1    A.    No.
2    Q.    And after the fourth and final conversation
3  you had when he was in the hospital, you never
4  thereafter attempted to talk to him again about what
5  had happened?
6    A.    No.  He was -- he was in the hospital.  He was
7  in care.  I'm not sure when he was coming back.  So --
8    Q.    Yeah.  But you're aware he got out of the
9  hospital at some point, right?
10    A.    I'm assuming, yeah.
11    Q.    Did you call him periodically and check on him
12  to find out when he got out of the hospital?
13    A.    No.
14    Q.    Why not?
15    A.    Because at that point that was turned over
16  to -- to claims.
17    Q.    Do you know why it was turned over to claims?
18    A.    Because, like, somebody had to take care of
19  the claims.  He was in the hospital.  So --
20    Q.    So --
21    A.    I'm not sure if he was coming back.  I wasn't
22  sure if he was, you know, home, workmen's comp.  I
23  didn't know.
24    Q.    So, you put your investigation on hold?
25    A.    Yes.

175

1    Q.    And it's still pending?
2    A.    Not complete.
3    Q.    When do you expect to complete it?
4    A.    We were waiting on Mr. Ovalle; and then in
5  transition, I no longer over power/HVAC.
6    Q.    Who took your role?
7    A.    Taylor Abel.  Sorry.
8    Q.    Taylor Abram?
9    A.    Abel.
10    Q.    Abel.  How do you spell that?
11    A.    A-b-e-l.
12    Q.    Is that a guy or a girl?
13    A.    It's a guy.
14    Q.    Where does he work?
15    A.    He is housed in Florida.
16    Q.    Did you tell Mr. Abel about what had happened
17  with Mr. Ovalle and that he needed to complete the
18  investigation?
19    A.    No.  I don't recall.
20    Q.    Why not?
21    A.    Again, once -- I was waiting on Art to tell me
22  when he was coming back; and since the employee was
23  not back, the investigation was at halt.
24    Q.    And then Art eventually left, right?
25    A.    I'm assuming.

176

1    Q.    So, nobody, to your knowledge, ever took any
2  additional efforts to complete the investigation of
3  this incident?
4    A.    Not to my knowledge.
5    Q.    And as of right now, you don't blame
6  Mr. Ovalle, do you?
7    A.    Blame him for what?  Explain.
8    Q.    Blame him for getting hurt.
9    A.    No.
10    Q.    Do you think that United Rentals bears any
11  responsibility for having a facility that allowed
12  water to seep through during rains that made the floor
13  slippery?
14         MR. WRIGHT:  Objection, form.
15    A.    No.
16    Q.    (BY MR. HAYNES)  So, you take zero
17  responsibility?
18         MR. WRIGHT:  Objection, form.
19    A.    We train our employees to recognize those
20  hazards.  We take appropriate action as they're doing
21  their tasks to ensure that they don't get hurt.
22    Q.    (BY MR. HAYNES)  So, because you say you've
23  trained the employees to recognize hazards, you're
24  saying United Rentals has zero responsibility to fix
25  or mitigate against the risks of rainwater seeping

177

1  through a garage door or creating a slippery floor at
2  one of its facilities?
3    A.    I'm saying that, as a United Rental employee,
4  we have the responsibility to ensure that.  You know,
5  we, again, mitigate or eliminate any hazards
6  associated with a task we're fixing to perform.
7    Q.    That would include rainwater seeping through
8  the bottom of a garage door at your facility?
9    A.    Correct.
10    Q.    That's a hazard?
11    A.    Potentially, yes.
12    Q.    And nothing has been done to mitigate against
13  it?
14         MR. WRIGHT:  Objection, form.
15    A.    He was cleaning his area.
16    Q.    (BY MR. HAYNES)  Other than giving him a
17  squeegee, nothing's been done to mitigate this?
18         MR. WRIGHT:  Objection, form.
19    A.    Not to my knowledge.
20    Q.    (BY MR. HAYNES)  So, the sum total of efforts
21  that United Rentals has made to mitigate against the
22  known hazard of rainwater seeping through a garage
23  door at one of its facilities, creating a slippery
24  floor, was to give the employee a squeegee?
25         MR. WRIGHT:  Objection, form.

178

1    A.    Not necessarily, no.
2    Q.    (BY MR. HAYNES)  What else have you done?
3          MR. WRIGHT:  Objection, form.
4    A.    I'm not sure.
5    Q.    (BY MR. HAYNES)  Can you state one thing,
6    other than giving him a squeegee, that United Rentals
7    has done?
8    A.    No, I cannot.
9    Q.    Do you know of anybody that would know more
10   about what has been done?
11   A.    I couldn't tell you.
12   Q.    You're -- you were the head of safety over
13   that area, weren't you?
14   A.    Correct.
15   Q.    Shouldn't you know about anything else that
16   would have been done, if anything?
17   A.    Nothing was communicated to me.
18   Q.    Did you follow up with the people that worked
19   there to find out?
20   A.    We talked about it.  I talked with Art about
21   it, and nothing was -- nothing had changed, and it
22   never became another issue.
23   Q.    So, the coincidence that nobody subsequently
24   was injured was driving your decision not to do
25   anything about the issue?

179

1          MR. WRIGHT:  Objection, form.
2    A.    No.
3    Q.    (BY MR. HAYNES)  That didn't play no role in
4    your decision not to do anything?
5    A.    No.
6    Q.    It was just the fact that Mr. Silva told you
7    it was an unusual weather event; and, therefore,
8    nothing needed to be done about it?
9    A.    Correct.
10   Q.    The squeegees would fix it?
11   A.    He didn't say or claim that the squeegees
12   would fix it, but he did state that it was an unusual
13   heavy rain.
14   Q.    Well, certainly you agreed at that time that
15   the squeegee should do the job?
16   A.    That was a form or a method of them mitigating
17   that hazard that was present at the time, yes.
18   Q.    That was the only form?
19         MR. WRIGHT:  Objection, form.
20   Q.    (BY MR. HAYNES)  Right?
21   A.    No.  There -- I mean, there could have been
22   other measures that took place; but --
23   Q.    Can you tell the jury the other measures?
24         MR. WRIGHT:  Objection, form.
25   A.    There is absorbent that was available in the

180

1    spill kits that could have soaked up the water, swept
2    it up.  There's --
3    Q.    (BY MR. HAYNES)  The spill kits that you
4    agreed with me earlier apply to hy -- hydrocarbon
5    environments, right?
6    A.    It applies to any liquid.
7    Q.    Really?  What's the brand name of the spill
8    kit?
9    A.    Couldn't tell you.  Spill kits are -- are
10   placed in the bay areas for them to use.  So, I don't
11   think there's a specific brand that they use.
12   Q.    You -- you don't -- can you tell me the make,
13   model, the characteristics, anything about the product
14   you're describing as the alleged way to fix the
15   water-on-the-floor problem?
16   A.    Are you asking me to describe what's in the
17   spill kit?
18   Q.    I'm asking you to tell me the characteristics
19   of a product that you're saying would fix the problem.
20   A.    Oh, it's --
21         MR. WRIGHT:  Objection, form.
22   A.    It's an absorbent -- it's almost like a --
23   like a cat litter that absorbs any liquid once you lay
24   it on the floor.
25   Q.    (BY MR. HAYNES)  And you told me earlier that

181

1    you didn't fault Mr. Ovalle for not using a spill kit,
2    right?
3    A.    No.
4    Q.    So, you don't fault him for that?
5    A.    No.
6    Q.    So, let me ask this.  Do -- does United
7    Rentals provide training to its employees that, if
8    there's water on the floor, you need to use a spill
9    kit that's a powder that's -- or a diaper, as we
10   discussed earlier, to put on the ground to absorb the
11   water?
12   A.    No.
13   Q.    So, the only mitigating -- strike.  New
14   question.
15         The only way that you can tell the jury
16   that United Rentals told its employees to mitigate the
17   hazard of rainwater seeping through a garage door onto
18   a floor that was slippery was to use a squeegee to
19   clean it; is that true?
20         MR. WRIGHT:  Objection, form.
21   A.    That's what they had to -- to mitigate the
22   hazard, yes.
23   Q.    (BY MR. HAYNES)  Okay.  And to the best of
24   your knowledge, from the day that Mr. Ovalle began
25   working at the Canyon, Texas, facility to the day he

---

**182**

1  was hurt, United Rentals did nothing else to prevent
2  the rainwater from seeping through that door, right?
3  A.  I couldn't tell.  I was not aware.
4  Q.  You can't cite one example of them doing
5  anything, can you?
6  A.  No, I cannot.
7  Q.  All right.  If you go to the second page of
8  Exhibit 7, please.  Do you know anything about Art
9  getting involved with taking Mr. Ovalle to the
10  hospital or to urgent care or anything like that?
11  A.  No.
12  Q.  Did he talk to you about that?
13  A.  No.
14  Q.  Did you ask him about that?
15  A.  No, I did not.
16  Q.  Do you deny that Mr. Ovalle is hurt?
17          MR. WRIGHT:  Objection, form.
18  A.  No, I do not.
19  Q.  (BY MR. HAYNES)  Do you know anything about
20  his current state of injuries?
21  A.  No, I do not.
22  Q.  Do you know if he's been able to work since
23  this incident?
24  A.  No, I do not.
25  Q.  You don't deny that he was seriously hurt, do

---

**183**

1  you?
2          MR. WRIGHT:  Objection, form.
3  A.  No, I do not.
4          (Karabanoff Exhibit No. 8 was marked)
5  Q.  (BY MR. HAYNES)  Sorry.  I hand you Exhibit 8.
6  Do you recognize that?
7  A.  Can I get time to look it over?
8  Q.  Sure.
9  A.  Yes.
10  Q.  Are those some of the interrogatories, also
11  known as questions, that you looked at to get ready
12  for today?
13  A.  Yes.
14  Q.  Okay.  So, I highlighted some of the things
15  that I wanted to ask you about.  So, the highlights
16  are mine, just for the record.  If you go to the first
17  question --
18  A.  Sure.
19  Q.  -- please.  It asks to identify all employees
20  on duty and working at the facility at the time and
21  scheduled to work there.  There's a lot of objections.
22  Then it starts answering at the bottom.  It says,
23  "Justin Wilson and Ryan Ferguson are known to have
24  been present on the premises in question at the time
25  it was reported by plaintiff," right?

---

**184**

1  A.  Right.
2  Q.  Is Justin Wilson the branch manager over
3  pumps, or he was at the time?
4  A.  Correct.
5  Q.  Okay.  And who's Ryan Ferguson?
6  A.  I'm not sure if he's a technician.  I'm not
7  sure what his position is.
8  Q.  Okay.
9  A.  I don't recall.
10  Q.  Did you ever talk to him?
11  A.  I don't recall.
12  Q.  Okay.  It also says, "Additionally" -- and I
13  don't know how to say the first name.  It's C-h-a-l-e.
14  "Dawson may also have been at the premises in question
15  at that time," right?
16  A.  I see that.
17  Q.  Do you know who that is?
18  A.  No.
19  Q.  Do you know if that's a man or a woman?
20  A.  I have no idea.
21  Q.  Okay.  You didn't interview that person, did
22  you?
23  A.  No.
24  Q.  All right.  If you go to the next page, No. 4,
25  please.  It says to "Please identify investigations,

---

**185**

1  root -- and latent cause analysis," et cetera.  Do you
2  see that?
3  A.  Yes.
4  Q.  And it doesn't give us an answer really.  It
5  just objects.
6          Have you told me about every
7  investigation the company's made, according to your
8  knowledge?
9  A.  Yes.
10  Q.  Which is the incident investigation that you
11  conducted, right?
12  A.  Correct.
13  Q.  All right.  Okay.  If you go to Question
14  No. 7, please.
15  A.  Uh-huh.
16  Q.  It says, "Please identify all instances of
17  which you were aware, prior to the incident in
18  question, that water seeped onto the floor of the
19  generator shop from the roof, from outside, or from
20  any other source," right?
21  A.  Right.
22  Q.  And there's a bunch of objections, and then it
23  starts answering.  Then it says, "Defendant's unaware
24  of any specific instances of water seeping in the bay
25  where Plaintiff was working; however, sometimes water

186

1    has been present in the bay at times due to water
2    being used in the bay or at times when water dripped
3    from equipment being brought inside the bay during wet
4    weather outside."  Did I read that right?
5         A.   Yes.
6         Q.   So, at a minimum, United Rentals knew that
7    sometimes, if it was raining outside and equipment was
8    outside and was brought inside the bay, rainwater
9    would get inside the building, right?
10        A.   Correct.
11        Q.   But to the best of your knowledge, there's no
12   prior knowledge at the company that there was a
13   problem with water seeping under the garage door?
14        A.   Correct.
15        Q.   And do you think that Mr. Silva will say the
16   same thing if I depose him under oath?
17        A.   I have not heard from him.  So --
18        Q.   Okay.  If you'd go to Question 10, please.  It
19   says, "As to the area of the facility known as the
20   generator shop," which is where Mr. Ovalle got hurt,
21   it says, "please identify when the drain or sump
22   outside the garage door to the generator shop was
23   first installed and by whom," right?  Do you see that?
24        A.   Yes.
25        Q.   And the answer is that it -- "The drain that

187

1    exists outside the garage door for the bay where
2    Plaintiff worked was installed prior to Defendant
3    operating at that location," correct?
4         A.   I see that.
5         Q.   Do you have any reason to dispute that?
6         A.   No.
7         Q.   So, the drain that existed outside the garage
8    door of the bay where Mr. Ovalle was hurt was there
9    when United Rentals moved in, right?
10        A.   Correct.
11        Q.   Okay.  And No. 11 asks, also, what the purpose
12   of that drain is.  You see that?
13        A.   I see that.
14        Q.   And it says, "That drain appears able to
15   collect some water from the exterior of the building,"
16   right?
17        A.   I see that.
18        Q.   When did United Rentals learn that?
19        A.   I have not -- no idea.
20        Q.   Do you know who provided the answer to this,
21   which says, "That drain appears able to collect some
22   water from the exterior of the building"?
23        A.   "Drain appears" -- well, it appears it's
24   obvious that there's a drain there; but that's the
25   extent of it, that I know of.  I'm not sure what the

188

1    purpose of that drain is.
2         Q.   Okay.  Would that be apparent to someone who
3    initially rented the facility, such as United Rentals?
4              MR. WRIGHT:  Objection, form.
5         A.   Facilities would have looked at it and made
6    that determination.
7         Q.   (BY MR. HAYNES)  Okay.  And they work for
8    United Rentals?
9         A.   Correct.
10        Q.   All right.  14 asks about slip-and-trip
11   prevention; anti-slip devices, such as mats, things
12   like that; and it lists none.  And that's correct,
13   isn't it?  There were no slip-prevention mats or
14   anything like that in that bay where Mr. Ovalle was
15   working, true?
16        A.   True.
17        Q.   And there was nothing stopping United Rentals
18   from installing some of those, right?
19        A.   Repeat that one more time.
20        Q.   There was stopping United Rentals from
21   installing any such mats, right?
22        A.   Right.  There was none present, no.
23        Q.   And there was nothing preventing you from
24   installing any, right?
25        A.   Correct.

189

1         Q.   And you're aware that anti-slip mats are
2    designed specifically to prevent slipping and tripping
3    on slick and wet floors, right?
4              MR. WRIGHT:  Objection, form.
5         A.   Yes, I am aware.
6              THE REPORTER:  I'm sorry?
7         A.   I am aware.
8         Q.   (BY MR. HAYNES)  16 asks about prior similar
9    incidents in the five-year period before this incident
10   took place; and the position of United Rentals is that
11   nobody has ever slipped on water at that facility
12   before, right?
13        A.   Correct.
14        Q.   The first time it's ever happened was
15   Mr. Ovalle on the day of this incident, right?
16        A.   To my knowledge.
17             MR. WRIGHT:  If we can take a break
18   whenever you're ready.
19             MR. HAYNES:  Okay.
20             MR. WRIGHT:  Or when -- whenever it's
21   convenient, I mean.
22             MR. HAYNES:  That's fine.  We can take
23   one right now.
24             THE VIDEOGRAPHER:  Off the record, 2:25.
25             (Brief recess)

190

```
1              THE VIDEOGRAPHER:  The time is 2:31,
2    back on the record.
3              (Karabanoff Exhibit No. 9 was marked)
4        Q.   (BY MR. HAYNES)  I hand you Exhibit 9.  Do you
5    recognize that?
6        A.   Yes, I see this.
7        Q.   What is that?
8        A.   This is Mr. Ovalle's evaluation that I saw in
9    preparing for this.
10       Q.   All right.  So, this is the true and accurate
11   copy of Mr. Ovalle's evaluation from 2017, which is
12   the year that Mr. Ovalle was hurt, right?
13       A.   Correct.
14       Q.   And the manager listed at the top is Carlos
15   Ortegon, right?
16       A.   Correct.
17       Q.   And we've talked about him today, true?
18       A.   True.
19       Q.   All right.  And this lists various areas of
20   Mr. Ovalle's work and basically grades his performance
21   on each area for the year 2017, right?
22       A.   Correct.
23       Q.   And Mr. Ovalle didn't work between April of
24   2017 and the end of 2017, right?
25       A.   Right.
```

191

```
1        Q.   So, this is covering a very narrow period of
2    the first essentially quarter of 2017, right?
3        A.   I'm sorry.  Can you -- I was trying to read.
4    Can you repeat that again, please?
5        Q.   Sure.  The -- this is -- and I think it's --
6    it actually says it on the first page under "Manager
7    Comments."  Right here.  I'll point you to it.
8        A.   Uh-huh.
9        Q.   It says, "The bulk of this review is based on
10   the period from January through March of 2017,"
11   correct?
12       A.   Correct.
13       Q.   All right.  That's simply because he didn't
14   work the rest of the year --
15       A.   Correct.
16       Q.   -- right?
17            All right.  And it -- under Section 2,
18   it talks about "Responsibilities."  Do you see that?
19   Right here.
20       A.   Yes.
21       Q.   The first one's "Safety"?
22       A.   Uh-huh.
23       Q.   Yes?
24       A.   Yes.
25       Q.   And it says "Manager Rating:  Needs
```

192

```
1    Improvement," right?
2        A.   Correct.
3        Q.   And the comments are, "Unfortunately, Albert
4    incurred an injury in March that has caused him to
5    miss the remainder of 2017 and that has left him on
6    leave of absence to this date.  So, the bulk of this
7    review is based on the period from January through
8    March of 2017," correct?
9        A.   Correct.
10       Q.   It says, "Albert was performing shop
11   activities when he slipped and was injured.  This is
12   very unfortunate and hinders Albert's ability to make
13   a living and how he interacts with his loved ones."
14   Did I read all that right?
15       A.   Yes.
16       Q.   Do you have any reason to dispute that
17   Mr. Ovalle's injury hinders his ability to make a
18   living?
19       A.   No.
20       Q.   Do you have any reason to dispute that
21   Mr. Ovalle's injury hinders how he interacts with his
22   loved ones?
23            MR. WRIGHT:  Objection, form.
24       A.   Not to my knowledge.
25       Q.   (BY MR. HAYNES)  And then it says, "This is a
```

193

```
1    failure on everyone associated with the branch,"
2    right?
3        A.   I see that.
4        Q.   Do you agree that Mr. Ovalle's injury is a
5    failure on everyone associated with the branch's part
6    at the United Rentals facility in Canyon?
7            MR. WRIGHT:  Objection, form.
8        A.   "This is a failure of everyone associated with
9    the branch."  No, I wouldn't agree.  I mean, there's
10   different -- different levels.  I mean, everybody --
11   we're trained.  Everybody is trained on doing the 360.
12   There was nobody present at the time of the -- of the
13   activity taking place.
14       Q.   (BY MR. HAYNES)  Mr. Ovalle wasn't unsafe.
15   You've already said that, right?
16       A.   Correct.
17       Q.   Mr. Ovalle didn't fail, did he?
18       A.   No.
19       Q.   Okay.  The rest of the reviews are either --
20   let's see.  He has -- excuse me.  Let me strike that.
21   New question.
22            What does O.E.C. mean?
23       A.   O.E.C. is the assets that we have.  O.E.C. not
24   available is equipment or assets that we have that's
25   not available, and we're measured by that.
```

194

1    Q.   Okay.  Meaning, that it's -- it's equipment
2 that United Rentals owns and is in the business to
3 lease; but for whatever reason, it's not available to
4 be leased at that time?
5    A.   Correct.
6    Q.   And it says he needs improvement on that,
7 right?
8    A.   Yes, I see it.
9    Q.   Do you have any understanding why?
10    A.   No.
11    Q.   Okay.  The remainder of the categories are all
12 good or very good, correct?
13    A.   Correct.
14    Q.   And the summary that the manager gives him on
15 page 114, where it says "Manager's Rating" under
16 "Competency Summary" -- do you see that?  Page 114?
17    A.   Yeah, yes.
18    Q.   You there?
19    A.   Uh-huh.
20    Q.   The -- his manager rated him as very good,
21 right?
22    A.   Correct.
23    Q.   So, there's no doubt in your mind that
24 Mr. Ovalle was a very good employee, right?
25    A.   Correct.

195

1    Q.   And you disagree with Mr. Ortegon's rating or
2 assessment that the injury of Mr. Ovalle was a failure
3 on everyone associated with the branch because you're
4 saying that Mr. Ovalle was working by himself?
5    A.   If --
6         MR. WRIGHT:  Objection, form.
7    A.   Nobody else was there, right?  So, it was --
8 nobody saw what occurred, right?  If anybody
9 associated with the branch would have been there and
10 didn't perform a stop work or didn't intervene, then I
11 believe that statement would be true.
12    Q.   (BY MR. HAYNES)  Do you think that United
13 Rentals believes that maintaining a safe workplace is
14 a collective responsibility among all employees in
15 management?
16    A.   Yes.
17    Q.   So, when someone get -- gets hurt, doesn't
18 United Rentals believe that it's a failure by
19 everyone?
20         MR. WRIGHT:  Objection, form.
21    A.   Repeat that question again.
22    Q.   (BY MR. HAYNES)  Doesn't United Rentals
23 believe that, when someone gets hurt, it's a failure
24 on the part of everyone, it's a collective
25 responsibility?

196

1    A.   It is a collective --
2         MR. WRIGHT:  Objection, form.
3    A.   -- response -- yes.
4    Q.   (BY MR. HAYNES)  All right.  What's your cell
5 phone number?
6    A.   What's that?
7    Q.   What's your cell phone number?
8    A.   40 --
9    Q.   Oh, strike that.  New question.
10         What was your cell phone number at the
11 time of this incident?
12    A.   409-273-2974.
13    Q.   What was your carrier or -- yeah, at the time
14 of the incident, what was your carrier?
15    A.   I believe it was AT&T.
16    Q.   What kind of phone do you have?
17    A.   IPhone.
18    Q.   Do you still have the same phone that you had
19 back then?
20    A.   No.
21    Q.   Do you still have text messages and e-mails
22 from March of 2017 and April of 2017?
23    A.   No.
24    Q.   What happened to them?
25    A.   Changed phones.  When was that?  We change

197

1 phones probably every year.
2    Q.   Okay.  Is it a company phone?
3    A.   Yes.
4    Q.   Is it a company-issued phone or just a
5 company-reimbursed phone?
6    A.   It's a company-issued phone.
7    Q.   Okay.  Who do you have to go through to get
8 the phone?  Like which department?
9    A.   I.T.
10    Q.   Okay.  Does I.T. also oversee the e-mails?
11    A.   I believe so.
12    Q.   Who oversees this database system we've been
13 talking about?
14    A.   Corporate safety.
15    Q.   In Chicago?
16    A.   Yes.
17         MR. HAYNES:  All right.  Pass the
18 witness.
19         MR. WRIGHT:  I'll reserve my questions.
20         THE VIDEOGRAPHER:  Off the record, 2:41.
21         (Deposition concluded at 2:41 p.m.)
22
23
24
25

Michael Karabanoff - August 12, 2019

51 (Pages 198 to 201)

---

198

```
1          CHANGES AND SIGNATURE OF MICHAEL KARABANOFF
2                  TAKEN AUGUST 12, 2019
3   PAGE/LINE      CHANGE              REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

---

199

```
1          I, MICHAEL KARABANOFF, have read the foregoing
2   deposition and hereby affix my signature that same is
3   true and correct, except as noted above.
4
5                    _____
                        MICHAEL KARABANOFF
6
7   THE STATE OF _____)
8   COUNTY OF _____)
9
10          Before me, _____, on
11  this day personally appeared MICHAEL KARABANOFF, known
12  to me (or proved to me under oath or through
13  _____) (description of identity card or
14  other document) to be the person whose name is
15  subscribed to the foregoing instrument and
16  acknowledged to me that they executed the same for the
17  purposes and consideration therein expressed.
18          Given under my hand and seal of office this
19  _____ day of _____, _____.
20
21
22                    _____
                      NOTARY PUBLIC IN AND FOR
                      THE STATE OF _____
23
24  My Commission Expires: _____
25
```

---

200

```
1   STATE OF TEXAS        )
    COUNTY OF HARRIS      )
2
3              REPORTER'S CERTIFICATION
               TO THE DEPOSITION OF
4                 MICHAEL KARABANOFF
               TAKEN ON AUGUST 12, 2019
5
6
7          I, Lisa D. Sanchez, Certified Shorthand
8   Reporter in and for the State of Texas, do hereby
9   certify that this deposition transcript is a true
10  record of the testimony given by the witness named
11  herein, after said witness was duly sworn by me.
12          I further certify that I am neither attorney,
13  nor counsel for, nor related to, nor employed by any
14  of the parties or attorneys in the action in which
15  this proceeding was taken.  Further, I am not a
16  relative nor employee of any attorney of record in
17  this cause, nor do I have a financial interest in the
18  action.
19
20
21
22
23
24
25
```

---

201

```
1          Certified to by me this 9th day of
2   September, 2019.
3
4
5
6
7
8
9
                    _____
10                  Lisa D. Sanchez, CSR
                    Texas CSR No. 4766
                    Expiration Date:  12-31-19
11                  MONARCH REPORTING, INC.
                    Firm Registration No. 314
12                  Expiration Date:  5-31-21
                    4109 Lillian Street
13                  Houston, Texas 77007
                    Phone:  (832) 618-1234
14                  Fax:  (832) 618-1235
15
16
17
18
19
20
21
22
23
24
25
```

202

```
1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF TEXAS
2                     AMARILLO DIVISION
3   ALBERTO OVALLE,          §
                             §
4   PLAINTIFF,               §
                             §
5   VS.                      § CIVIL ACTION
                             § NO. 2:18-CV-00211-D-BR
6                            §
    UNITED RENTALS           §
7   (NORTH AMERICA), INC.,   § JURY TRIAL
                             §
8   DEFENDANT.               §
9
10
11            REPORTER'S CERTIFICATION
12         DEPOSITION OF MICHAEL KARABANOFF
13                AUGUST 12, 2019
14
15       I, Lisa D. Sanchez, a Certified Shorthand Reporter
16   in and for the State of Texas, hereby certify pursuant
17   to the Federal Rules and/or agreement of the parties
18   present to the following:
19       That this deposition transcript is a true record of
20   the testimony given by the witness named herein after
21   said witness was duly sworn by me;
22       That the amount of time used by each party at the
23   deposition is as follows:
24       Mr. Kevin C. Haynes, Attorney for Plaintiff - 4:01
25       Mr. Jeff C. Wright, Attorney for Defendant - 0:00
```

203

```
1        That a copy of the deposition transcript along with
2    the original changes and signature pages was submitted
3    on September 9, 2019, to the attorney for the
4    witness for examination, signature, and return of the
5    original changes and signature pages to Monarch
6    Reporting, Inc., to by October 9, 2019;
7        That the original changes and signature pages
8    were/were not returned to the deposition officer.  All
9    changes made by the witness, if any, are attached
10   hereto;
11       That on _____ the original deposition
12   transcript, or a copy thereof, together with copies of
13   any exhibits was delivered to the custodial attorney,
14   Mr. Kevin C. Haynes, Attorney for Plaintiff;
15       That pursuant to information given to the
16   deposition officer at the time said testimony was
17   taken, the following includes counsel for all parties
18   of record:
19       Mr. Kevin C. Haynes, Attorney for Plaintiff;
20       Mr. Jeff C. Wright, Attorney for Defendant;
21       That a copy of this certificate was served on all
22   parties shown herein.
23
24
25
```

204

```
1        Certified to by me this the _____ day of
2    _____, _____.
3
4
5
6
7
8        _____
         Lisa D. Sanchez
9        Texas CSR No. 4766
         Expiration Date:  12-31-19
10       MONARCH REPORTING, INC.
         Firm Registration No. 314
11       Expiration Date:  5-31-21
         4109 Lillian Street
12       Houston, Texas 77007
         Phone:  (832) 618-1234
13       Fax:  (832) 618-1235
14
15
16
17
18
19
20
21
22
23
24
25
```